[Jordan, et al. v. McClure Lumber Co., et al.]

# Jordan, *et al. v.* McClure Lumber Co., *et al.*

## *Quieting Title.*

(Decided July 6, 1910.   Rehearing denied Jan. 12, 1911.
54 South. 415.)

1. *Quieting Title; Bill; Amendment.*—The bill in this case examined and held sufficient as a statutory bill to quiet title, and properly amended so as to authorize the cancellation of defendant's alleged title as a cloud upon that of complainant.

2. *Same; Sufficiency.*—A bill which alleges actual occupancy by the complainant under claim of absolute ownership, and denying any title or valid claim in the respondent, was sufficient to test the title to the land.

3. *Same; Right of Action; Title to Sustain.*—A perfect equitable title or actual possession as against persons showing no superior title is sufficient in order to maintain an action to quiet title and cancel defendant's claim as a cloud, and it is not necessary that the complainants should show a legal title in itself.

4. *Same; Possession; Sufficiency.*—In order to maintain a suit to quiet tite the complainant must show a peaceable possession as distinguished from a scrambling one, though his possession need not be undisputed; merely going upon land in the actual possession of another at the time, and claiming title thereto and warning such other off, is not sufficient possession to maintain or defeat an action under the statute.

5. *Same; Evidence.*—The evidence in this case stated and examined and held to authorize an inference that the particular money paid for the lands in controversy, was paid into the state treasury.

6. *Public Land; Grant; Validity.*—Purported patents to swamp and overflow lands, which had been granted by the government to the state, which were not signed by the governor, but merely in his name by his Secretary under a general direction from the governor to sign his name to such patent, and which were not under the great seal of the state, as required by the Constitution and statutes, were not effectual to pass the legal titles.

7. *Same; Grant by State; Purchaser; Private Entry.*—The act relating to the disposition of swamp and overflow lands by the state, (Acts 1861, p. 12) did not require that these lands be sold only to actual settlers; the phrase "at private entry," contemplated a sale thereof to citizens generally.

8. *Same; Disposition; Who May Purchase.*—The act relating to swamp and overflow lands, and their disposition by the state, (Acts 1861, p. 12) does not require that the sale be only to certain individuals, or limited quantity sold to any person; hence, a railroad

19—170

company could have purchased all of such lands, or procured others to purchase same, and assign the certificate of purchase to it.

9. *Same; Approval by Governor; Sufficiency.*—Under the Acts of 1861, p. 12, relating to the disposition of swamp and overflow lands by the state, there was sufficient approval of the sale by the Governor, where patents were, in fact, issued to the purchasers, signed by the governor under a general direction to his Secretary to sign all such patents as should be legally signed by him, although the patents were invalid, because not signed by the governor himself, and not having the great seal of the state attached as required by the constitution and statutes.

10. *Evidence; Documentary.*—Land certificates issued more than thirty years before the trial, in the absence of circumstances to create suspicion, were ancient and self proving documents, and it was not necessary that they should come from the proper source, or even be exhibited to the court for inspection as to genuineness or age.

11. *Same.*—Ancient land certificates are self proving, and the recitals therein are evidence that there were such persons as those named in the certificate, and that they purchased the land in question.

12. *Same; Judicial Notice; Sale of State Lands.*—This court will take judicial notice that the sale of swamp and overflow lands belonging to the state has for years received the attention of the legislature.

13. *Statutes; Title; Subjects.*—The title and the body of the act should be construed together, and when so construed a very general title is usually sufficient to cover all the subjects in the body of the statute which are germane to such title; under such construction the title of the Act of Feb. 12, 1879, (Acts 1878-9, p. 198) was sufficient to embrace the provisions confirming the sales of swamp and overflow lands.

14. *Constitutional Law; Construction.*—All presumptions are indulged in favor of the validity of a statute, and the unconstitutionality must appear beyond a reasonable doubt before it will be held to be unconstitutional.

15. *Appeal and Error; Review.*—Where the only ground is declared to be untenable to sustain appellant's title in an action to quiet title, this court upon reaching such decision, need not consider other assignments.

APPEAL from Washington Chancery Court.

Heard before Hon. THOMAS H. SMITH.

Bill by the McClure Lumber Company and others against Fred J. Jordan and others, to quiet title to land. From a decree for complainants, respondents appeal. Affirmed.

The following is the agreed statement of facts filed in this case September 5, 1908:

"(1) That this agreement may be used by either party upon and in the trial of each of the above stated cases, subject, however, to all proper objections for irrelevancy and immateriality,. and that this agreement should be filed in each of said cases, and shall be treated as properly in each of said cases.

"(2) That all of the lands in controversy in all of said cases are what are known as 'swamp' and 'overflow' lands, and were certified and patented to the state of Alabama by the United States under and pursuant to Act of Cong. Sept. 28, 1850, c. 84, 9 Stat. 519.

"(3) That on the 13th day of February, 1872, the Governor of Alabama issued a proclamation or order declaring and ordering that all swamp lands and overflow lands were thereby and therupon withdrawn from sale.

"(4) That 'An act for the sale of swamp and overflow lands of the state of Alabama' approved February 8, 1861 (Acts 1861, p. 12), was repealed by an act approved February 26, 1872 (Acts 1871-72, p. 53), in all respects as appears from the last-mentioned act.

"(5) That Henry St. Paul, as swamp land commissioner or agent of the state of Alabama, and John R. Tompkins, as a receiver appointed by the Governor of Alabama under the provisions of the act of February 8, 1861, executed and issued the hereinafter named certificates all dated February 12, 1872, numbered as and for the land hereinafter claimed, each of which certificates recited that the parties to whom they were issued had purchased and paid for the land therein described. The numbers, name of purchaser, and description of land contained in each of said certificates, respectively, are as follows: 1797, N. W. $\frac{1}{4}$, Sec. 4, T. 6 N. 2 W.; 1798, Andrew Wright, S. W. $\frac{1}{4}$, Sec. 4, T. 6, R. N. 2 W.; 1796, Cyrus Gill, S. $\frac{1}{2}$ of S. E. $\frac{1}{4}$, and S. E. $\frac{1}{4}$

of S. W. ¼, Sec. 5, T. 6, R. N. 2 W.; 1799, John Blake, N. E. ¼ of Sec. 8, T. 6, R. N. 2 W.; 1800, John Townsley, N. W. ¼, Sec. 8, T. 6, R. N. 2 W.; 1801, Thomas Ellis, S. E. ¼, Sec. 8, T. 6, R. N. 2 W.; 1803, Henry Boise, N. W. ¼, Sec. 8, T. 6, R. N. 2 W.; 1804, Joseph Hatch, S. W. ¼ of Sec. 9, T. 6, R. N. 2 W.; 1810, John Dunham, N. E. ¼, Sec. 17, T. 6, R. N. 2 W.; 1811, Aaron Butler, S. E. ¼, Sec. 17, T. 6, R. N. 2 W.; 1812, Edward Chappellee, N. E.¼, Sec. 20, T. 6, R. N. 2 W.; 1813, Frank Dyson, N. W.¼, Sec. 20, T. 6, R. N. 2 W.; 1814, Daniel Tyerl, S. E. ¼, Sec. 20, T. 6, R. N. 2 W.; 1815, Benjamin Stokes, S. W. ¼, Sec. 20, T. 6, R. N. 2 W.; 1816, George Reid, N. E. ¼, Sec. 21, T. 6, R. N. 2 W.; 1817, Henry Cale, N. W. ¼, Sec. 21, T. 6, R. N. 2 W.; 1818, John Williams, S. E. ¼, Sec. 21, T. 6, R. N. 2 W.; Williams Ayres, S. W. ¼, Sec. 21, T. 6, R. N. 2 W. (The description of this land should be read as all lying in township 6 north, and range 2 west.)

"(6) That no one of the men above named ever lived on the lands described in the certificate issued in his name, or even in Washington county, nor did he enter upon or settle on the said lands, or any part thereof, at any time before the so-called patents herein mentioned were issued therefor to the assignee of his said certificate, and that no settlement of any kind except as hereinafter stated was ever made on any of the lands above described before the 10th day of October, 1903.

"(7) That each of said certificates purports to have been assigned to the Mobile & Ohio Railroad Company, and thereafter the so-called patents were issued to the Mobile & Ohio Railroad Company. Each of said patents were signed as follows: 'Robert B. Lindsey, Governor of Alabama, by W. V. Chardavoyne, Secretary.' That the said Chardavoyne was the private secretary of Robert B. Lindsey, Governor of Alabama, and that the on-

ly authority that the said Chardavoyne had for sign-
ing said patents was a general instruction by the Gov-
ernor to his secretary to sign the Governor's name to
such patent for swamp and overflow lands as properly
and legally should be signed by the Governor. That
none of said patents had affixed thereto the seal of the
state of Alabama, but each of them had affixed thereto
and impressed thereon and recited therein a seal con-
taining the words, 'Land Office of Alabama.' That none
of said patents were attested by the Secretary of State.
That all of said so-called patents were dated February
20, 1872. That, with the exception of numbers, names
and description of lands, all of them are the same as
the so-called patent which was issued as herein before
explained to the Mobile & Ohio Railroad Company, as
assignee of Andrew Wright, for the S. W. ¼ of section
4, township 6 N., range 2 W., which original so-called
patent is hereto attached, marked 'Exhibit A' and made
a part hereof, for the purpose of more fully explaining
and showing the exact method of execution, and the
contents of each of the so-called patents, the others of
the said patents as above stated being executed in the
same manner and on the same blank form and being,
respectively based upon the respective certificates above
mentioned, all running to the Mobile & Ohio Railroad
Company, as the assignee of the respective party to
whom said certificates were issued. That none of said
so-called patents were ever recorded in the office of the
Secretary of State, but in a tract book kept in the of-
fice of the Secretary of State there was entered in tab-
ulated form, the following ruling and arrangement of
such tract book, the following data, with respect to each
of said certificates: The number of the certificates, its
date, the name of the party to whom issued, the descrip-
tion of the land purchased, and the purchase price, and

these entries in so far as concerns the land described correspond with the certificate above described, and that all of said patents so called were recorded in the office of the judge of probate of Washington county, Ala., on January 23, 1886.

"(8) That the following conveyances, each of which embraces all. of said lands, were executed and recorded as hereinafter claimed: Two trust deeds executed on May 12, 1879, by the Mobile & Ohio Railroad Company, to the Farmers' Loan & Trust Company, trustees. One of said trust deeds secures a $7,000,000 bond issue, and the other secures certain debentures. One was filed for record in the office of the probate judge of Washington county on June 16, 1879, and the other was filed for record on June 18, 1879. They both include all the lands above described, and both confer on the trustee power to sell and dispose of the land at private sale, etc. The Farmers' Loan & Trust Company as trustee executed to H. R. Wager and Willard B. Wells a deed conveying all of the above-described land, which deed was dated July 7, 1880, and recorded October 11, 1891, in the office of the judge of probate of Washington county. Willard B. Wells and wife executed to Fred L. Wager under date of October 20, 1890, a deed purporting to convey an undivided one-sixth interest in all of the above-described lands. This deed was filed for record in the office of the judge of probate of Washington county, Ala., on April 20, 1893. Willard B. Wells and wife executed to Nanta Wager under date of October 20, 1893, a deed conveying an undivided one eighteenth interest in said land. This deed was filed for record in the office of the judge of probate of Washington county, Ala., on December 2, 1893. The remainder of whatever interest the said Willard B. Wells had in said land passed by his will to his wife,

Sallie T. Wells, and his son, Morris D. Wells. The said Sallie T. Wells is dead, and whatever interest she had in said lands has passed by her will to her sole heir at law, namely, her daughter, Gertrude A. P. Page, one of the complainants in this cause. H. R. Wager and wife and Fred L. Wager and wife, Nanta Wager, executed to the McClure Lumber Company under date of January 1, 1907, a deed conveying a 44/54 interest in all of the above-described land. This deed was filed for record October 28, 1907. It is not admitted by the respondents that any of the grantors in the several conveyances above mentioned had any title to the lands conveyed, this being one of the questions which was to be tried in each of these cases, but it is admitted that each and all of said deeds were regularly executed in proper form and self-proving, and that, if the respective grantors therein had any title to the lands conveyed, such title passed by said deeds. The said Farmers' Loan & Trust Company, Willard B. Wells, Sallie T. Wells, Morris D. Wells, Gertrude A. P. Page, H. R. Wager, and Ophelia Wager, his wife, were always nonresidents of the state of Alabama.

"(9) That each and all of the grantees, except the Mobile & Ohio Railroad Company, in the several deeds set forth in the paragraph next preceding of this agreement, claimed the said land and assessed and paid the state and county taxes thereon each year from the time that this deed was executed, as hereinabove shown, for such grantee until such grantee conveyed away the land as hereinabove shown, and that the complainants in said cause have claimed and assessed and paid taxes thereon on all of the above-described land ever since the execution of a conveyance to them as hereinabove shown. Any claim to said land and paying taxes thereon by the railroad company is left open to proof.

"(10) That on the 15th day of November, 1907, the Alabama Insane Hospital executed and delivered to said Fred J. Jordan an instrument, a true copy of which is hereto attached, marked 'Exhibit B,' and to William M. Beech an instrument, a true copy of which is hereto attached, and marked 'Exhibit C,' and to James M. Beech, a true copy of which is hereto attached, and marked 'Exhibit D.' It is admitted that the said instruments were executed pursuant to and under the authority conferred by the board of trustees of said Alabama Insane Hospital, and each of said instruments was recorded in the office of the judge of probate of Washington county, Ala., on the 7th day of December, 1907.

"(11) That on the 10th day of October, 1903, all of the above-described land, except as hereinafter stated, were in the woods, and no one living thereon or having the same under cultivation or under fence. That on the 15th day of November, 1907, the said lands were still in the woods, and no one living on any part of them, except as herein noted, and none of them were under fence or being used or utilized in any manner, except for the purpose of cutting a few trees for stave timber, and getting turpentine as hereinafter set forth.

"(12) That during the year 1878 one David W. Jordan built a house about the center of the N. W. $\frac{1}{4}$ of section 20, township 6 N., range 2 W., and placed in cultivation a few acres of the land. That about the year 1900 the said Jordan vacated the said premises, and William M. Beech took possession thereof, and has ever since occupied and used the same as his home. The occupation by the said Jordan and the said Beech has been continuous for the respective periods above named, but the extent and character of the possession, and claim of each of said parties, the transactions

[Jordan, et al. v. McClure Lumber Co., et al.]

whereby and whereunder they claim, and all other matters connected with their occupancy of said premises, are not agreed upon, but are left to be shown by evidence.

"(13) That as soon as the said respondents, respectively, received the instrument executed to them, respectively, by the Alabama Insane Hospital as hereinabove shown, they each, respectively, openly claimed to own, respectively, the lands described in the said respective instruments, and the complainants had notice of such claim before they filed their bills in the above-stated cause.

"(14) That all of the lands in controversy in the cases above stated were and are what is known as pine timber lands, being covered with a growth of fine pine timber, which timber constitutes by far the greater portion of the value of said land. That during the winter of 1906-07, and the spring of 1907, complainants, acting through D. R. Lewis Naval Stores Company, boxed for turpentine substantially all of the trees upon the land involved in the three cases above mentioned, and worked the same for turpentine in the usual manner up to this time. That there were a few trees that stood in low or marshy places which were not boxed at the time above mentioned, but these trees were afterwards boxed by the complainants acting through said D. R. Lewis Naval Stores Company in the winter of 1907-08, and about 80 to 100 acres of said lands were boxed in March, 1908.

"(15) Paragraph 11 hereof is so modified as to permit proof of any actual residence upon any of said land or the cultivation of any part thereof for crops of turpentine.

"(16) That either party to either of said causes may introduce on the trial any legal evidence of any mate-

rial facts not in conflict with this agreement, the purpose hereof being to reduce to an agreed state of facts those facts about which there is no controversy, and to leave the parties to said causes free as to all other matters."

This agreement was signed by Stevens & Lyons as solicitors for complainant, and by Sam Will John, solicitor for respondents.

Exhibits B, C, and D, referred to, were deeds from the Alabama Insane Hospital, the lands known as "swamp" and "overflow" lands, executed to Jordan and others as mentioned under and by virtue of an act of the Legislature of Alabama, approved October 10, 1903, and found in Gen. Acts Ala. Sess. 1903, p. 495. This agreement was made in the following cases: McClure Lumber Co. et al. v. Fred G. Jordan, McClure Lumber Co. et al. v. William M. Beech, and McClure Lumber Co. et al. v. James M. Beech, Jr.

GREGORY L. SMITH, JOHN W. McALPINE TYSON, WILSON & MARTIN, and SAM WILL JOHN, for appellant. To maintain a bill in the statutory aspect complainants must show peaceable possession at the time as distinguished from a disputed, contested or scrambling possession.—*Johnson v. Johnson,* 147 Ala. 542; *Ladd v. Powell,* 144 Ala. 408; *Randall v. Daughdrill,* 142 Ala. 490; *Lyons v. Arndt,* 142 Ala. 486. In order to maintain a bill in its second aspect, or as amended in this case, the complainant must show that it had at the commencement of the suit either the legal or equitable title to the property.—17 Enc. P. & P. 300. The Act of 1861, p. 12, does not commit to the commissioner or agent the determination of whether such sales of swamp and overflow lands had been legally made, and hence, these certificates were not evidence that such sales were

legal. To create an equitable title, there must exist a right to go into a court of equity under the present status, and demand the conveyance of a legal title.— *Bradley v. Bell,* 142 Ala. 384. The Act of 1878-9, p. 198, is unconstitutional and void because the subjects of the act are not stated in the title.—*L. & N. R. R. Co. v. K. C. M. & B. R. R. Co.,* 124 Ala. 169; *Lindsey v. U. S. S. & L. Assn.,* 120 Ala. 156, and cases there cited; *Bell v. The State,* 115 Ala. 87; *Brown v. The State,* 115 Ala. 74; *White v. Burgin,* 113 Ala. 170; *Ex parte Gayle,* 108 Ala. 514; *Bradley's Case,* 99 Ala. 117. The state is not estopped to deny title of the purchasers by an unconstitutional act of the Legislature.—*Haywood v. Binding Co.,* 42 S. C. 148; *Norton v. Shelby County,* 118 U. S. 442; *County of Wyandotte v. Kansas City,* 17 Pac. 326. The state is not estopped by receipt of the purchase money because it is not shown that it was ever paid to the proper officer of the state.—*State v. Brewer,* 64 Ala. 294. The recitals in the certificate are not sufficient evidence of this fact.—*U. S. v. Ross,* 92 U. S. 707; *Turner v. City of Mobile,* 135 Ala. 73; *Murray v. Barnes,* 40 So. 348; 2 Her. on Estoppel, Sec. 1222; 26 A. & E. Enc. of Law, 447. No presumption arises in this case from the lapse of time, as the existence of a valid grant by the state cannot be presumed. —22 A. & E. Enc. of Law, 1290-1. There is no evidence of any assignment to the M. & O. Railroad Company. The only agreement in the statement of facts relative thereto being that the certificates purported to be assigned, which means that the certificates recite that they have been so assigned.—*Reading's Case,* 2 Leach. 250; *Gilchrist's Case,* Id. 657. The contention that the papers are ancient documents and that, therefore, an admission that such instrument existed placed them in the same position as if produced, is not sound.—*Carter*

[Jordan, et al. v. McClure Lumber Co., et al.]

v. *Chaudron,* 21 Ala. 91; *White v. McLean,* 124 Ala. 465; *Farmer v. Eslava,* 11 Ala. 1039; 2 Enc. of Law, 326; Phillips on Evi., Sec. 203-5. Evidence of the custody of an ancient document is given only to afford the judge a reasonable assurance of its authenticity.—8 Q. B. 160; 73 Ill. 109; 7 East. 291; 1 Greenl. Sec. 570; 1 Enc. of Evi. Sec. 862. The patents under which plaintiffs claimed were fatally defective.—Sec. 889, Code 1907; 2 Black. Comm. 305, 346-7; Const. 1868. These defects .appearing on the face of the record of the so-called patent constituted constructive notice to the complainant.—*Ritter v. Dudley,* 42 Ala. 622; *Johnson v. Thweatt,* 18 Ala. 741. Under the facts in this case there could be no constructive possession in complainant.—Sec. 3364, Code 1907; *Smith v. Gordon,* 136 Ala. 498; *Black v. T. C. I. & R. R. Co.,* 93 Ala. 111; *Young v. Latham,* 132 Ala. 344. That the patents were void see *Knight v. U. S. S. L. Assn.,* 142 U. S. 176; *McGarrahan v. Mining Co.,* 96 U. S. 320. This being true, the act of 1903, granting these lands to the Insane Hospital, and the sale by the Insane Hospital to these respondents operated as a legal conveyance of the land, and respondents were entitled to a verdict confirming their title.

STEVENS & LYONS, for appellee. Every right was well pleaded.—*Fowler v. Ala. I. & S. Co.,* 45 So. 637. It was properly amended so as to enlarge the scope and purpose of the bill.—*Smith v. Gordon,* 136 Ala. 497. The owner of property in possession may maintain a bill to remove cloud from title whether his title be legal or. equitable. It may be maintained by one with a purely equitable claim not in possession.—*Shipman v. Furniss,* 69 Ala. 555. As against one who shows no superior title, the presumption arising from actual posses-

sion is sufficient to maintain such bill.—Pom. Eq. Rem.
Sec. 732; *Higdon v. Kennemar,* 120 Ala. 198; *E. & P.
M. Co. v. Gibson,* 62 Ala. 372. The deeds and patents
sought to be cancelled constitute clouds upon complain-
ant's title.—*Rea v. Longstreet,* 54 Ala. 291; *Parker v.
Boutwell,* 119 Ala. 301. It was not required that the
complainant have the legal title, but may rely upon his
possession unless the respondent shows a superior
claim.—*Brand v. U. S. C. Co.,* 128 Ala. 579. The dis-
tinction is clearly drawn between the dispute over the
title and a dispute over possession.—*Wood L. Co. v.
Williams,* 47 So. 202; *Rosebrook v. Baker,* 44 So. 198.
The receipts and patents were ancient documents, and
are sufficient to establish that the land was paid for.
—*Wood v. Montevallo C. & T. Co.,* 84 Ala. 563. If the
parties executing the receipts for the certificates had
the right to make the sale, a perfect equity was vested
in the purchaser.—*Goolsbee v. Fordham,* 49 Ala. 202;
*Bates v. Herron,* 35 Ala. 124. The presumption will be
indulged that the officers discharged their duty by the
order of and with the consent of the government in
whose name the acts were done.—*Mobile v. Eslava,* 9
Port. 596. For analogies to this rule see *Nofire v. U. S.,*
164 U. S., 660, and authorities cited; *Best v. Polk,* 18
Wall. 112; *Wolson v. Brown,* 58 Ala. 64; *Woodall v.
Oden,* 62 Ala. 128; *Ashworth v. The State,* 63 Ala. 124;
*Gessnard v. L. & N.,* 76 Ala. 457; *Dunklin v. Wilson,*
64 Ala. 167; *Paul v. Malone,* 87 Ala. 544; *Ward v.
Ward,* 108 Ala. 281. From the proof in this case the
legal and valid execution of the assignments of said cer-
tificate will be presumed, and no further proof need be
introduced.—*Doe v. Eslava,* 11 Ala. 1028; *Alexander
v. Wheeler,* 78 Ala. 167; *White v. Farris,* 124 Ala. 461;
*Campbell v. Bates,* 143 Ala. 338. The certified copy of
an ancient document is self proving.—*Allison v. Little,*

85 Ala. 516; *White v. Hutchins,* 40 Ala. 257. The effect of the assignment was to please the assignee in the same position which the assignor had occupied before the assignment.—*Faulkner v. Jones,* 12 Ala. 170; *Homan v. Stewart,* 103 Ala. 644. The Act of 1879, p. 198, was not only a confirmation, but was a sale of the land to the purchaser. This act was constitutional.—*State v. Crook,* 126 Ala. 600; *Montgomery v. Birdsong,* 126 Ala. 632; *Shepherd v. Dowling,* 127 Ala. 1; *A. G. S. v. Reid,* 124 Ala. 253; *State v. Rogers,* 107 Ala. 453; *Ex parte Pollard,* 40 Ala. 99. The sale was also confirmed and ratified by the Act of 1888, p. 5.—*McAuley v. Brock,* 16 Cal. 26. The receipt of the purchase money by the state estopped the state from claiming the land. —*Dudley v. Gallops,* 128 Ala. 238; *A. F. & M. Co. v. Dykes,* 111 Ala. 89; *Robins, etc., v Wooten,* 128 Ala. 379; *Oden v. Dupree,* 99 Ala. 45; *Swift v. Calman,* 63 Am. St. Rep. 446. The ratification of the Legislature estops the state.—*Robinson v. Pebworth,* 71 Ala. 240; *Goodman v. Winter,* 64 Ala. 410-437; *Robertson v. Bradford,* 73 Ala. 116; *Nunn v. Norris,* 58 Ala. 202; *Bland v. Bowie,* 53 Ala. 152; *Wright v. Ware,* 50 Ala. 549; *Bell v. Craig,* 52 Ala. 215. One who accepts the benefits under a sale is estopped from claiming title to the property sold.—*Oden v. Dupuy,* 99 Ala. 36. Even the beneficiary under a trust is estopped to deny the validity of an unauthorized sale so long as he retains and enjoys the benefits derived from it.—*Marx v. Clisby,* 130 Ala. 510-11-12, s. c. 126 Ala. 107; *Garland v. Watson,* 74 Ala. 323; *Rogers v. Torbut,* 58 Ala. 525. While it is generally held that the doctrine of estoppel cannot be applied to the sovereignty while exercising its governmental functions through its ministerial offices, yet it is also well established that the substantial principle underlying the doctrine of estoppel applies to

[Jordan, et al. v. McClure Lumber Co., et al.]

the sovereignty.—*U. S. v. Stinson*, 125 Fed. 910; *Chope v. Detroit P. R. Co.*, 37 Mich. 195; *Commonwealth v. Andre*, 3 Pick. 224. Estoppel by deed or record applies to the sovereignty as it does to the citizen.—*Dudley v. Gallops*, 128 Ala. 238; *Magee v. Hallet*, 22 Ala. 718; *Menard v. Massey*, 8 Howard 293; *Patton v. Gilmer*, 42 Ala. 558; 26 A. & E. Ency. of Law, 477; note to *State v. Jackson*, 16 C. C. A. 353. In handling its swamp and overflowed lands the state was merely converting its lands into money by means of contracts with its citizens No governmental trust or function attached to its ownership of these lands.—Sec. 2479 R. S. of U. S. (6 Fed. Statutes Ann. 399); Act of 1861 (Acts of 1861, p. 12; *Rogers, etc., Works v. American Equipment Co.*, 164 U. S. 559 (41 L. Ed. 558). As a general proposition, any reasonable presumption is indulged to uphold any transaction which dates back more than twenty years.—*Wilson v. Holt*, 83 Ala. 540; *Matthew v. McDade*, 72 Ala. 389; *Gosson v. Ladd*, 77 Ala. 235; *Davis v. M. & C. R. R. Co.*, 87 Ala. 641; *Thompson v. Thompson*, 91 Ala. 595. Confessedly the only claim of appellant to the lands is based upon the grant contained in the Act of October 10th, 1903, and the change therein made in carrying the same into the Code as sections 879 to 882, inclusive. The lands in controversy were not granted to the trustees of the Alabama Insane Hospitals by the original act above mentioned, nor by section 879 of the Code, because, first, the state then had no power to grant, and, second, the aforesaid grant does not embrace or include any lands then claimed under an alleged purchase from the state. There is no reason why the state is not subject to the same rule that controls the United States in the matter of disposing of lands. It is well settled that after the government has made any arrangement whereby the right, perfect

or inchoate, to the land is vested in the purchaser, it has no power to convey those lands to any other person, and any deed or patent made in such an effort is void, although all the authorities hold that until the issuance of a patent to the purchaser the legal title rests in the government for the benefit of the purchaser.—*Goolsbee v. Fordham,* 49 Ala. 204; *Dudley v. Gallops,* 128 Ala. 238; *Bates v. Herron,* 35 Ala. 124; *Knabe v. Burden,* 88 Ala. 436; 3 Washburn on Real Property, Sec. 2034.

MAYFIELD, J.—The original bill in this case was filed under chapter 127 of the Code of 1907 (sections 5443-5449) to quiet and determine claims to land. It was subsequently amended so as to ask additional relief in having respondents' title canceled as a cloud upon that of complainants'.

Complainants (appellees here) claim title through the Mobile & Ohio Railroad Company, which company, in turn, claimed title under instruments in form patents from the state of Alabama, dated February 20, 1872, and which were not properly signed by the Governor and attested by the Secretary of State, as the law directs, but were signed by one Chardavoyne, the private secretary of the Governor. None of these patents bore the great seal of the state, but had stamped upon them what purported to be a seal of the "Land Office of Alabama." These purported patents were issued to the said railroad company as the assignee of various land certificates issued of date February 12, 1872, to various persons under act of the Legislature of Alabama of 1861 (page 12), relating to sale and disposition of swamp and overflowed lands. The purported patents recited, in substance, that the Mobile & Ohio Railroad Company, as assignee of such land certificates, had deposited the same with the receiver of

[Jordan, et al. v. McClure Lumber Co., et al.]

swamp and overflowed lands of Alabama, whereby it was made to appear that full payment had been made for the lands described therein by the original holders of the certificates, as was provided by act of the Legislature of February 8, 1861 (page 12), and that the same lands had been purchased by the Mobile & Ohio Railroad Company as assignee of such certificates. Such purported certificates were not recorded in the office of the Secretary of State, but in the tract books of his office were entered the numbers of the certificates, the names of the parties to whom issued, a description of the lands, and the purchase price in each particular case. These patents, however, were recorded in the probate office of Washington county, the situs of the land, on January 23, 1886. The Mobile & Ohio Railroad Company conveyed the lands on May 1, 1876, by a deed of trust, and the trustee therein named conveyed the lands on July 7, 1890, and thereafter the grantees in that deed and their assignees claimed the lands and assessed and paid the taxes each year. The lands are open pine lands, well timbered, and were not utilized for any purpose until the winter of 1906-07. About this time the pines of these lands were boxed for turpentine purposes by the appellees, and have since been used for that purpose. The original patents in form, or certified copies thereof, as to all these lands, are in evidence.

It also appears that on February 20, 1872, the receiver of swamp and overflowed lands paid into the state treasury $20,000 as proceeds of sales of swamp and overflowed lands, and shortly thereafter made additional payments which made the aggregate $27,343.31. The tract book of Washington county, Ala., purports to show that each one of the various holders of these land certificates who subsequiently assigned to the Mo-

bile & Ohio Railroad Company acquired the respective tract of land described in his certificate as early as February 12, 1872. The Mobile & Railroad Company claimed these lands from the date of the purported patents, to wit, February 20, 1872, to the date of the sale by their trustees, to wit, July 7, 1890, averring that during this claim it had agents who looked after all its lands, these included; that these lands were in litigation as the lands of the railroad company while in the hands of a receiver; that it several times mortgaged the lands; and that the mortgages were recorded in the county of the situs of the lands. The railroad company contracted to sell these lands, and this contract was enforced in the courts in a suit by the trustee of the railroad company and Wager & Wells, who were assignees of the contract of sale, and these parties from that time till they parted with their rights claimed to own and held possession of, the lands for themselves and associates from 1890 to 1902, when they sold and delivered possession to these complainants (appellees here), who have ever since continuously claimed, and exercised some kind of ownership over, the lands, until the winter of 1906-07, when they were for the first time practically utilized by the boxing of the pines for turpentine, as before stated, after which the use for this purpose for several years at least is shown to have been necessarily continuous and open occupancy, during which time the parties maintained houses on the lands for their laborers, and built roads over and across the same.

There was an act of the Legislature of February 12, 1879 (pages 198-199), the titles of which was: "To further regulate the securing, preservation, and sale of the swamp and overflowed lands of the state." Section 3 of this act, among other things, provided: "That the titles of all persons or corporations who at any time

prior to the passage of this act, shall have purchased any part of the swamp and overflowed lands belonging to this state from any person or persons acting as agent or receiver, or professing to act as agent or receiver of this state, for said swamp and overflowed lands, and the purchase money of which has been paid, be and the same are hereby confirmed unto said purchasers, their heirs, successors and assigns, and all the right and title which this state may have, or may have heretofore had, to any part of said lands so purchased is hereby relinquished, and forever confirmed to and unto the said purchasers, their heirs, successors and assigns. * * *." On November 26, 1888 (see Acts 1888-89, p. 5), was passed an act, the title of which was, "An act for the relief of purchasers of swamp and overflowed lands, or lands in lieu of the same which have been or may be hereafter patented to this state." That act reads as follows: "Section 1. Be it enacted by the General Assembly of Alabama, that the Governor of the state be empowered and he is hereby authorized to issue a patent to the purchasers of the swamp and overflowed lands or the lands in lieu of the same, which may have been patented to this state, or which may hereafter be patented to this state upon satisfactory proof being made to him that such lands have been fully paid for either in money, or in scrip sold and transferred by him and authorized by the acts of Congress to be received in payment of such lands." On December 17, 1873 (Acts, p. 65), an act was passed which provided for the adjustment of the claims of persons for services with respect to swamp and overflowed lands, which recited, in its preamble, that the swamp and overflowed lands were sold by the state, and then provided that the claims should be paid out of the proceeds of the sales of these lands. On January 31, 1875 (Acts 1874-

75, p. 137), an act was passed which recited in its preamble that the swamp and overflowed lands had been in part sold by its agents, and the sum of $27,343.31 had been paid into the state treasury, and the act proceeds to appropriate this sum to the Alabama Insane Hospital, reserving a part to pay the expenses of procuring and selling the lands. It will be observed that this is the exact aggregate amount shown to have been paid into the state treasury on February 20, 1872, with the two additional payments made soon thereafter, and that the patents and land certificates as for the lands in this case purport to show that the purchase price for the lands in question was paid to the receiver on or before the 13th of February, 1872, the date of issuing the certificates.

On February 9, 1877 (Acts 1876-77, p. 77), another act was passed to provide for the appointment of a commissioner for the swamp and overflowed lands. This act recognized that there had been previous sales of those lands, and provided that the commissioner should investigate such sales and report the result to the Governor, and take possession of such lands as had not been sold, and sell the same; but there is no proof that such commissioner ever took possession of these lands or attempted so to do.

The respondents, appellants here, claim title by deed and purchase of October 17, 1908, from the trustees of the Alabama Insane Hospital, who, in turn, claimed under a grant from the state by virtue of an act of the Legislature of October 10, 1903 (page 495), now sections 879 et seq of the Code. Demurrers to the bill were overruled, and the case was finally submitted on the bill, the answer, and the voluminous proof by both parties; and on the hearing the chancellor granted the relief prayed in the bill, from which decree respondents appeal, assigning appropriate errors.

[Jordan, et al. v. McClure Lumber Co., et al.]

The bill was in all respects sufficient and fully explicit, complied with all the statutory requisites of a bill to quiet title, and determine claim to lands.—Chapter 127, Code. The scope and prayer of the bill was properly extended by amendment so as to cancel a cloud on title, and the amended bill was in all things sufficient to support the prayer for relief, and the decree which was rendered.—*Smith v. Gordan,* 136 Ala. 497, 34 South. 838; *Fowler v. A. I. & S. Co.,* 154 Ala. 497, 45 South. 637; *Shipman v. Furniss,* 69 Ala. 555, 44 Am. Rep. 528. The bill sufficiently alleges title and possession to maintain the statutory bill, and also the prayer for additional relief of removing a cloud from title. It alleged actual occupancy under claim of absolute ownership, and denied any title or valid claim on the part of the respondents. It was sufficient in all respects for the purposes for which it was filed, and to test at least the equitable title to the land.—*Higdon v. Kenncmer,* 120 Ala. 198, 24 South. 439; Pomeroy's Eq. Pl. § 732. The deeds and patents sought to be canceled constituted clouds upon complainant's title if the allegations of the bill were true.—*Parker v. Boutwell,* 119 Ala. 301, 24 South. 860; *Rea v. Longstreet,* 54 Ala. 291. It is not at all necessary that complainants' bill and proof should have shown the legal title in order to authorize the relief prayed or decreed. A perfect equity is sufficient, or actual possession as against those who show no superior title or claim.— *Brand's Case,* 128 Ala. 579, 30 South. 60; *Fowler's Case, supra.* It has, however, been uniformly held that, in order to maintain a statutory bill like this, the complainant must allege and prove a peaceable possession as distinguished from a scrambling one. The statute, as well as the decisions, require this.

It is insisted by the appellants that the proof failed to support this necessary feature of the bill. In this, however, they are in error. The agreement of counsel, together with all the proof, shows that complainants were in possession at the time of the filing of the bill —in the actual possession. It is true that the evidence shows that some of their employees were ordered off the lands by the respondents, and that the latter posted notices on the land warning complainants not to trespass thereupon. This was, however, a mere adverse claim of title. It was not possession on the part of the respondents such as to defeat the bill. In fact, it was this very claim of title or right on the part of the respondents which authorized the filing of the bill against them. This is the very kind of disputed claim or title which the statute is intended to quiet or determine. Merely going upon lands which are at the time in the actual possession of another, and claiming title thereto and warning such other off, is not such possession as will maintain or defeat a bill filed under the statute. It requires actual possession or constructive possession; and while it must be peaceable, it does not mean that the right or title thereto must not be disputed, for that is what the suit is intended to determine and quiet. The real object and purpose of the suit is to determine whether respondents have any title, right, or claim, legal or equitable, in the lands the subject of the suit; and, if so, to determine its character and extent. In order to do this, it becomes necessary, owing to the undisputed facts in the case, to first determine whether or not the complainants have a perfect equity or a legal title; for the reason that both parties claim through a common source (the state of Alabama) and the respondents unquestionably have title, both paramount and legal, unless the title, legal or equitable, had passed

out of the state before the grant of the swamp and over-
flowed lands to the hospital, and provided that these
lands in question passed by that grant. On the other
hand, if the complainants had acquired the legal title or
a perfect equity, before the grant by the state to the
hospital, then, of course, the hospital acquired no title
by reason of the grant, and did and could convey none
to these respondents.

There is a written agreement in this record shown
between the parties to the appeal, or their attorneys,
as to many of the facts of the case, which agreement
the reporter will set out in full; for upon it or upon
some of its recitals, in a large measure, must depend
a correct decision of this case. The following are some
of the recitals of that agreement which we deem ma-
terial and conclusive of the rights of the parties to this
suit:

"That all of the lands in controversy in all of said
cases are what are known as 'swamp' and 'overflowed'
lands, and were certified and patented to the state of
Alabama by the United States under and pursuant to
the act of Congress of the 28th day of September, 1850."

"That Henry St. Paul, as a swamp land commission-
er or agent of the state of Alabama, and John R.
Thompkins, as a receiver, appointed by the Governor
of Alabama under the provisions of the act of Febru-
ary 8, 1861, executed and issued the hereinafter named
certificates, all dated February 12, 1872, numbered as
and for the lands, hereinafter shown, each of which
certificates recited that the party to whom it issued had
purchased and paid for the lands therein described."

"That each of said certificates purports to be assign-
ed to the Mobile & Ohio Railroad Company, and there-
after, so-called patents were issued to the Mobile &
Ohio Railroad Company. Each of said patents was

signed as follows: 'Robt. B. Lindsey, Governor of Ala-
bama, by W. V. Chardavoyne, Secretary.' That the
said Chardavoyne was the private secretary of Robert
B. Lindsey, Governor of Alabama. That the only au-
thority that the said Chardavoyne had for signing said
patents was a general instruction by the Governor to
his secretary to sign the Governor's name to such pat-
ents for swamp and overflowed lands as properly and
legally should be signed by the Governor. That none
of said patents had affixed thereto the seal of the state
of Alabama, but each of them had affixed thereto and
impressed thereon, and recited therein a seal contain-
ing the words 'Land Office of Alabama.' That none of
said patents were attested by the Secretary of State.
That all of said so-called patents were dated February
20, 1872."

"That all of the lands in controversy in the cases
above stated were and are what is known as pine tim-
ber lands, being covered with a growth of fine pine tim-
ber, which timber constitutes by far the greater value
of said lands. That during the winter of 1906-07, and
the spring of 1907 complainants, through D. R. Lewis
Naval Stores Company, boxed for turpentine substan-
tially all of the trees upon the lands involved in the
three cases above mentioned, and worked the same for
turpentine in the usual manner up to this time."

"That either party to either of said causes may intro-
duce on the trial any legal evidence of any material
facts not in conflict with this agreement, the purpose
hereof being to reduce to an agreed state of facts those
facts about which there is no controversy, and to leave
the parties to said causes free as to all other matter."

The patents thus issued to the Mobile & Ohio Rail-
road Company were not properly executed as the Con-
stitution and the statutes prescribed, and were there-

fore ineffectual to pass the legal title to the lands de-
scribed therein; but they do serve as ancient documents
and color of title.

These certificates or receipts, and the so-called pat-
ents, all being shown and admitted to be ancient docu-
ments more than 30 years of age, and the certificates
or receipts all purporting to be assigned to the patentee,
the Mobile & Ohio Railroad Company, before the pat-
ents were issued (which was February 20, 1872), they
were all self-proving documents; there being no circum-
stances casting suspicion on their genuineness. The is-
suance of the documents by the persons purporting to
have issued them and that they were issued more than
thirty years ago being admitted, they need not come
from the proper source or even be exhibited to the
court for inspection as to genuineness and age, for this
is all that an inspection or that evidence that they
come from the proper custody would avail.—*Woods v.
Montevallo Co.*, 84 Ala. 560, 3 South. 475, 5 Am. St.
Rep. 393, and authorities there cited; 2 Wigmore on
Ev. 1257; Jones on Ev. 308. In fact, this court has
held that certified copies of documents which purport
to be over 30 years of age and which have been recorded
for 20 years are self-proving.—*Allison v. Little*, 85 Ala.
516, 15 South. 221; *White v. Hutchings*, 40 Ala. 257,
88 Am. Dec. 766. These cases have been modified by
the later case of *O'Neal v. T. C. I. & R. R. Co.*, 140 Ala.
378, 37 South. 275; but not as to the proposition an-
nounced above. That case merely decides correctly
that age cannot give validity to a document void on
its face. Moreover, all explanations as to the source
from which the documents came and the custody is
rendered certain by the proof. The only reason of the
rule that the ancient document shall come from the
proper depository is that credit is thereby given to its

genuineness. No one depository or custody is considered the necessary one. All that is required is that it be a natural one, and that its appearance be unsuspicious, which are questions for the trial court.—Wigmore on Ev. 2139. The patents were recorded, and recite that the patentee, as assignee of the holder of the certificate, had deposited the certificate or receipt in the office of the Secretary of State. This was for the evident purpose of obtaining the patent, and was the authority of the state for issuing the patent—it reciting the sale, describing the land, the parties, the transfer, and the payment of the consideration. The fact that the patent was invalid because not properly executed does not change the rules of evidence as to ancient documents. The so-called patents recited on their face most all of the material facts shown by the receipts; and what they lack the agreement supplies.

This being true, it therefore conclusively appears that the officers who were authorized so to do sold these lands to various parties named in the receipts or certificates of purchase, who paid the purchase money therefor, and that these certificates were transferred or assigned to the Mobile & Ohio Railroad Company, to which corporation the state attempted to issue patents, but failed for the sole reason that the patents were not executed in the mode provided by law; and it sufficiently appears that the proceeds of these sales were paid by the state's officers into the state treasury, and were thereafter appropriated by the state as funds received from such sale, and that the sales were thereby and thereafter ratified by the state, through its Legislature, the proper source of power to ratify.

It is insisted that no sales are shown because it is not sufficiently shown that there were any such persons as those named in the certificates, or that any such per-

sons purchased the lands in question. This is exactly what the ancient documents prove, and is the very reason of the law making them self-proving and evidence of their recitals and of the existence of other documents so recited therein. The rule of ancient documents as evidence are the children of necessity. The reason therefor is the improbability of obtaining living testimony to the proof of execution, that the witnesses to prove the facts are dead, or inaccessible, and that, the primary evidence being gone, we must resort to the next best, which opportunity enables us to lay hands upon, as a substitute.—*Northrop v. Wright,* 24 Wend. (N. Y.) 228. As Lord Ellenborough said, in *Roe v. Rawlings,* 7 East. 291, ancient documents are admissible in evidence in specified cases because it is hard to prove ancient things otherwise. The probability is that all the parties to these documents are dead or inaccessible as witnesses; and for this very reason the documents are self-proving and admissible in evidence. If their execution and recitals were sufficiently proven by other evidence, there would be no necessity or reason for the rules. This is a striking case for the application of the doctrine of ancient documents and prescription. The transactions here were dealings between citizens and officers of the same state, all of which happened nearly 40 years ago, and they are now assailed in the courts, for the first time, after death has sealed the lips of every party to the transaction and time has destroyed many of the documents.

In speaking of this rule and the presumptions arising from the lapse of time (more than 20 years), this court has said. "More than 30 years elapsed after the making of the conveyance before the commencement of this suit, during which time the defendants and those under whom they claimed have been in open, notorious,

and adverse possession, claiming title. The period of time had expired after which it is the policy of the law to quiet past transactions, and when courts will indulge for this purpose all reasonable presumptions. After such lapse of time, and such uninterrupted possession, it is permissible to invoke the rule of prescription in favor of a due execution of the power of sale, and of the regularity and validity of a conveyance, sufficient in law to pass the estate and title of the grantor.— *Matthews v. McDade,* 72 Ala. 377; *Doe ex dem. Gosson v. Ladd,* 77 Ala. 235. "Twenty years is a period of time beyond which the courts are not disposed to permit past human transactions to be disturbed by judicial investigation.—*McArthur v. Carrie's Adm'r.,* 32 Ala. 75, 80 (70 Am. Dec. 529) ; *Garrett v. Garrett,* 69 Ala. 429; *Baker v. Prewitt,* 64 Ala. 551. In *Sims v. Aughtery,* 4 Strob. Eq. 103, the following language was used by the Supreme Court of South Carolina : 'Twenty years continued possession will raise the presumption of a grant from the state of deeds, wills, administrations, sales, partitions, decrees, and (the chancellor has said) of almost anything that may be necessary to the quieting of title, which no one has disturbed during all that period.'—*McArthur v. Carrie's Adm'r, supra,* pages 91-83 of 32 Ala. (70 Am. Dec. 529). And this court has held that this presumption will not be defeated by infancy, coverture, or other personal disability.—*McCartney v. Bone,* 40 Ala. 536; *Garrett v. Garrett, supra.* Nor will its operation be suspended by causes which have been legally adjudged to suspend the running of statutes of limitation.—*Harrison v. Heflin,* 54 Ala. 552."—*Matthews v. McDade,* 72 Ala. 388, 389.

It was not necessary that these swamp and overflowed lands be sold only to actual "settlers." Such is not the provision of the statute. The phrase, "at private

entry," used in the act of 1861, has no such meaning. This court has decided in the case of *Goolsbec v. Fordham*, 49 Ala. 202, that the transaction called an entry of land in this state is simply a sale of the public lands to a citizen. The certificate of sale is merely the evidence of the sale until the patent is issued. There is nothing in the act of 1861 which required the sales to be only to certain individuals, nor that limited the quantity to be sold to any one individual. The Mobile & Ohio Railroad Company might have purchased all of these lands itself, if it and the agents and officers of the state saw fit to make the purchase and sale. Nor did the act prevent the railroad company from procuring other parties to purchase the lands for it, and to assign the certificates of purchase to it, which seems to have been done from an inspection of these records. While no witness testifies to this, it is shown by all the circumstances that this was probably done. We see no valid or legal reason why the railroad company should have adopted this circuitous method of making the purchases; but there was in it nothing illegal per se, nothing sufficient to avoid the sales after this great length of time. There may have been reason existing, which we cannot now know that justified the mode and manner of purchase to which resort was had. It is not shown that the fact was not then known to the state or its officers. All that now appears tends to show that it was as open to them, as it is now to us, and was all recorded and ratified when the purported patents were issued to the railroad company. No objection was then assigned on this or any other account against the validity of the sales; nor any reason assigned why patents should not issue. But, on the other hand, there was an attempt to so issue, which failed only because the patents were not executed or signed in the manner provid-

[Jordan, et al. v. McClure Lumber Co., et al.]

ed by law. No doubt that all the parties concerned thought at the time that same had properly issued and in accordance with the law and the facts.

It is also urged against the sales that the act required an approval of the sales by the Governor before they were completed, and that the evidence does not show such approval. We think the record does show all the approval by the Governor that the law ever contemplated. If the patents had been properly executed, of course,, approval would be thereby implied; and we can see no difference, as to the fact of approval, that the attempt to execute the patents was abortive. Had the sales not been thus approved, certainly no attempt would have been made to execute patents, and the attempt to execute them implies approval, rather than a disapproval or a want of knowledge or of action on the part of the Governor. Of course, if the patents had been properly signed, attested, and fully executed, as the law directs, the legal title would have passed thereby; there would then be no occasion to infer an approval of the sales so as to create a perfect equity to the lands. If appellants' contention is correct, no approval could be implied unless the patents were properly issued, in which case there would be no necessity or occasion for such implied approval. The sales in question being made before the act of 1879 (above referred to), they were confirmed by that act. It expressly confirmed all sales of swamp and overflowed lands wherein all purchase money had been paid made by any one purporting to act as an agent of the state. These sales were unquestionably of swamp and overflowed lands, and were made by persons purporting to act as agents of the state, to whom all the purchase price was paid, and by whom, we think this evidence reasonably shows, it was paid into the state treasury, being thereafter ap-

propriated by the state, according to law, to the Alabama Insane Hospital. It is true, as argued, that there is no evidence to show that the particular money paid for these particular lands was paid into the state treasury, nor could we reasonably expect the evidence to show this at this late date, when the parties to the transaction are dead, or their testimony is not obtainable. It does, however, show that the money was paid to the proper agent of the state, and that it was so paid and received as the consideration for swamp and overflowed lands of the state—these particular lands —and this same agent soon thereafter paid a large amount of money into the state treasury as the proceeds from sales of swamp and overflowed lands, and that the Legislature of the state soon afterwards by enactment appropriated the identical amount shown to have been so paid in as the proceeds of sales of such lands. All that is needed to identify it beyond a reasonable doubt is a minute description of the lands so sold, of which it was the purchase price. The lands sold were described only as swamp and overflowed. Those in question were included in that general description. There is no evidence tending to show they were not so included. No lands were particularly described by this evidence, of which this money was the proceeds, nor was it expected that they would be so described. The certificates or receipts given the purchasers by the state's agent were intended for this purpose, and they specifically describe these lands.

It is also insisted by appellants that this act of 1879 is unconstitutional and void, and does not effect a ratification of these sales, for the reason that the title of the act was not sufficiently broad to authorize, warrant, or embrace that part of the body of the act which ratified and confirmed these sales. To this argument we

cannot yield our assent. The authorities cited and re-
lied upon by counsel are not in point. The title of the
act is as follows: "To further regulate, the securing,
preservation, and sales of the swamp and overflowed
lands of the state." It is certainly no strained or un-
reasonable construction to hold that to confirm or rat-
ify a thing is to regulate it. And to confirm or ratify
a sale of lands is certainly securing and preserving the
sale, as well as the lands to the purchaser. There is
no reason why the act was not intended for the benefit
and protection of the purchasers of the lands as well
as for that of the state. It acts in præsenti as well as
in futuro. It relinquished all claim or title the state
then had, as to lands for which the purchase price had
been paid. The act is distinguishable from the act con-
strued in *Lindsay's Case*, 120 Ala. 156, 24 South. 171,
42 L. R. A. 783. There the title of the act was, "To
regulate the business of building and loan associations
in this state," which title further attempted to enumer-
ate the respects in which the business should be regu-
lated. The enumeration covers nearly a page of the
printed acts, but contains no intimation or reference
to the "premiums," "fines," or "stocks" theretofore tak-
en by building and loan associations as being interest
or loans on usurious contracts. The body of the act
then proceeded to provide, contrary to the express de-
cisions of this court as to subjects of "premiums,"
"fines," and "stocks" theretofore or thereafter taken
by such companies, that they could not be considered as
interest for loans, but should be taken to represent pre-
miums, and should be collected as debts, according to
the stipulations of the agreement. The effect of the
act, of course, was to overrule the decisions of this
court upon those questions, and without letting the
Legislature or the people know about it. The provis-

ions were stricken down in that case because expository legislation, attempting to compel the court to construe contracts according to legislative judgment, after these provisions were thus stricken down (for the reason stated), the court did decide that they were void because of the respective feature which was not indicated in the title. We have no criticism 'to make of what is said in that opinion, about retrospective logrolling and hodge-podge legislation; but it, like all other decisions, should be confined to the cases in hand, or those put in the decisions.

What was said in that case was apt to the case under consideration, but it is not so to the act construed in this case. The facts in the two cases are different. There, there was an attempt to give the executed contracts between individuals a construction by the Legislature which the courts had refused to give them. Here it is shown by the record (and, if not so shown, the court judicially knows) that the sales of these swamp and overflowed lands had been for years and years the subject of the constant care of the Legislature. Nearly every year for 10 or 15 the Legislature passed some act authorizing and regulating the sales of these lands. It had provided for the appointment of special and general agents to sell, to collect the money therefor, to make deeds, or to have patents issued to the purchasers, and to recover back the lands in cases in which the purchaser did not pay for them. Then, in 1879, the Legislature passed this act in question, the title of which was, "To further regulate the securing, preservation, and sale of the swamp and overflowed lands of the state." Could anything be more germane or cognate to that title than to provide for collecting the purchase price, for conveying titles to the purchasers upon payment of the price, and, where the price

was not so paid, to provide for the recovery of the land? This is exactly what the act did. It authorized the Governor to collect the purchase price where it had not been paid, or to bring suit therefor or suit for the recovery of the land; and provided that, in cases where the purchasers paid all of the purchase price, the titles to the property should vest in the buyers by virtue of the act, without any patent or other conveyance—all of which was cognate and germane to the title. If this were not true, the act was without operation and effect either for the weal or woe of the state or its citizens. We cannot agree to the argument that the title had reference to future sales only. Why to future sales, any more than to past sales or to sales being negotiated, if they were the subject of, and needed, further regulation? The title of the act does not say future sales, and there is nothing to so limit or restrict the word "sales." The body of the act deals almost, if not entirely, with pending, and past sales; there being very little, if any, reference to future sales. The title of the act being, among other things, "to further regulate sales," this very language shows that it was intended to apply to pending or past sales; otherwise it would have been to authorize sales. As was said by Chief Justice Stone (*Ex parte Byrd,* 84 Ala. 20, 4 South. 398 [5 Am. St. Rep. 328]), in construing a prohibition law, "the very essence of regulation is the existence of something to be regulated"; and when the expression is "to further regulate," does it not imply, not only the existence of the thing to be regulated, but also that it is already partially regulated?

For these and other reasons that might be assigned we feel no hesitancy in holding that this act was not void or inoperative for this purpose, because its title fails to embrace the subject of confirming sales of

swamp and overflowed lands. A liberal construction
and all presumptions in favor of the validity of an act
should always be indulged; and to warrant striking it
down its unconstitutionality should appear beyond a
reasonable doubt. A very general title is held to be
sufficient to cover all things in the body of the act ger-
mane and cognate to such title; and the title and the
act in such cases should be construed together.—*State
v. Crook*, 126 Ala. 600, 28 South. 745; *Sheppard v.
Dowling*, 127 Ala. 1, 28 South. 791, 85 Am. St. Rep.
68; *A. G. S. R. R. Co. v. Reed*, 124 Ala. 253, 27 South.
19, 82 Am. St. Rep. 166; *Birdsong's Case*, 126 Ala. 632,
28 South. 522. So construed, we have no doubt of the
constitutionality of the statute in question upon the
point adverted to.

It should also be observed that this act of 1879 (p.
198) confirmed all sales of such lands by any one pur-
porting to act as an agent of the state, where all the
purchase money had been paid, except those in which
the agent had some interest. The act could scarcely
have been broader or more sweeping in its terms, to the
end of including the sales in question. The Legislature
was certainly the one body or agency of the state which
had the authority to bind it as to the sales and grants
of these lands; and this agency of the state, with full
knowledge of all the facts as to these sales and transac-
tions, had the sales of these lands under consideration
on several occasions; but it never repudiated or rescind-
ed them, or any other like them, and on every occasion
apparently it disclaimed any intention to disaffirm, ul-
timately passing the act to ratify all sales in the con-
dition of these lands. The conclusion is irresistable that
these particular sales were so confirmed by the Legis-
lature. Even the act (now sections 879-882 of the
Code) which granted the remainder of these swamp and

overflowed lands to the hospitals under which these respondents claim title, expressly provided that it was not intended to interfere with or disturb the title and possession of the purchasers or present owners of lands sold prior to February 12, 1879; such prior sales being confirmed by an act of the Legislature of that date. The sales under which complainants claim title having been made prior to said last-mentioned date, and within the protection of the statute of February 12, 1879, it clearly appears that the lands in question and the complainants' rights or titles thereto were not within or affected by this subsequent grant to the hospital, and that the deed of the trustee to respondents, attempting to convey these lands, is a cloud upon complainants' title, and should be removed. This act being the only ground of respondents' claim or title, it clearly appears that they have none, as was decreed by the chancellor.

It is therefore unnecessary to pass upon any other questions argued or assigned as error.

The decree of the chancellor is in all things affirmed. Affirmed.

DOWDELL, C. J., and ANDERSON, McCLELLAN, SAYRE, and EVANS, JJ., concur.