51 So.2d 677

### PIERCE v. LEE BROS. FOUNDRY CO., Inc.

### 7 Div. 84.

Supreme Court of Alabama.

April 5, 1951.

See also 253 Ala. 320, 44 So.2d 750.

---

Ross Blackmon, of Anniston, for appellant.

Knox, Jones, Woolf & Merrill, of Anniston, for appellee.

FOSTER, Justice.

This is a statutory bill by appellee to quiet title under authority of section 1109, Title 7, Code. There is no question as to the sufficiency of the bill. The land to which title is sought to be quieted is thus described in the bill: "All that part of Section 17, Township 13, Range 7 East, which lies south of the old railroad grade except that part of SW¼ of SW¼ of said Section 17, which lies west of the road running from Cobb City to Peek's Hill, Alabama." From a decree granting relief on evidence taken *ore tenus* before the trial judge, the respondent has appealed.

The bill alleges the peaceable possession by complainant at the time it was filed on January 14, 1949. The respondent denied that complainant was in such peaceable possession, but alleged that he was himself in possession of it and claimed under a chain of title which he submitted. The primary contention of appellant is that the evidence does not sustain a finding of peaceable possession by complain-

ant, but only a contested and scrambling possession. Their respective claims to the strip of land is illustrated by their chains of title.

The title of complainant originated with a deed from John D. Kirby and R. W. Kirby to Annie L. Kirby Stringer (Estes). This deed conveyed their undivided interest, together with other land adjoining on the south, in "that part of Secion 17, Township 13, Range 7, lying south of the old railroad grade, containing ninety-four acres more or less." That deed is dated August 5, 1903. On November 27, 1923, the trustee under the will of Annie L. Kirby (Stringer) Estes deeded the land to R. A. Hindman. On September 9, 1925, Hindman and wife deeded it to Fred Lucy. Hindman was then living on the land. On September 21, 1925, Fred Lucy deeded to Carl Lay a one-half interest in the land. They began to build a large lake for recreation purposes on the adjoining land, which was also included in the conveyance, and a lodge and keeper's cottage. About ninety to one hundred feet south of the old grade and near the western side there was a dwelling house for tenant occupancy. They placed a tenant by the name of Etherton in possession of it. The yard extended to the grade on the north. In 1927 along the southern border of the grade the Lays erected a wire fence north of a field (five or seven acres) which was cultivated up to that fence. The fence extended into the woodland beyond to protect the recreation area from intruders. Since 1890 there had been a public road on the site of the graded portion of the railroad bed. The county had control of it as such. The old railroad had graded it for their purposes, but at this location it had not been used by the railroad within the memory of any witness, if it was ever so used. On October 22, 1926, Carl Lay and Fred Lucy deeded all of the land to the Waynee Lake Corporation, a corporation controlled by the Lays, and it finished the lake and other improvements. The same tenant continued to occupy the house and cultivate the land to the edge of the grade where the wire fence stood. The land in question extending east from the cultivated field was wood-land and there is no evidence of any act of actual possession by anyone of this particular strip prior to or at the time of the filing of this bill, except wherein mentioned. The contention relates to that part of a strip of land one hundred feet wide extending south from the center of the graded road and east and west through section 17, supra, which was south of the south line of the grade of said road. The county commissioner testified that the roadway there as graded and worked was thirty feet wide or fifteen feet on each side of the center. So that the controverted strip is approximately eighty-five feet wide extending along the south side of the graded roadway. The Waynee Lake Corporation caused to be cultivated by tenants that part of the land which was in cultivation. This continued until the company sold it all to Carl, Earl, Orville, Tracy and Everett Lay on March 18, 1941. In October of the same year Carl Lay sold his interest to the other Lays. Everett Lay then moved into the lodge on the land and continued to live there until May 5, 1948 when all the Lay owners conveyed the land to Owens. J. J. Scales moved into the tenant house January 5, 1948 as the tenant of the Lays and continued to occupy it and cultivate the land to the time of the filing of this suit. Owens deeded it to Propst on June 2, 1948. There was more or less valuable timber on the east end of the tract. On June 30, 1948, Propst sold the land to complainant Lee Brothers Foundry Company, reserving the timber rights of certain dimensions, until January 1, 1950.

On December 10, 1948, Pierce put another lock on the gate in the wire fence near the east side of the field, which gate opened the field to the road above. There was a lock already there. On that day, when Lee heard about it, he caused the lock placed there by Pierce to be taken off leaving his own. Scales was still a tenant on the place. Propst was the owner of the timber. On January 12, 1949, Pierce sent his tenant through the wire fence and cut one small tree which was standing on this strip of land. He was immediately stopped. There was no other act hostile

to the Lees then or thereafter occurring up to the time this suit was filed on January 14, 1949. The Lees did not own the timber, as stated above. On September 16, 1948, Pierce and Propst, the owner of the timber, had some controversy about cutting the timber. The Lees had nothing to do with it. Pierce and Propst settled the controversy between themselves. That transaction was not in hostility to the Lees.— Wood Lumber Co. v. Williams, 157 Ala. 73, 78, 47 So. 202.

Pierce claimed the land through the following chain of title. On April 4, 1887, one Vashti Kirby conveyed to Jacksonville, Gadsden and Attalla Railroad Company a right of way strip two hundred feet wide, known as the right of way and road bed of the old Alabama and Tennessee River Railroad Company. The government numbers do not correspond with those in controversy in all respects. On May 9, 1887, Richard, John D. and Annie L. Kirby (recited in the deed to be the children of A. W. Kirby) conveyed by quitclaim to the same company one hundred feet of the same described land. They appear to be the children of Vashti Kirby and A. W. Kirby. The same error in the government numbers appears. A roadway was graded, but when nor by whom is not shown. It does not appear that it was ever used as a railroad bed. On June 22, 1914 that railroad company appears to have made a deed to W. J. Greenleaf conveying its interest, being two hundred feet wide. Greenleaf is identified as connected with the Chattanooga, Gadsden and Gulf Railroad Company. The government numbers still do not correspond with the land in controversy in all respects. There is no evidence of possession of any of it by Greenleaf. At that time the road bed as graded had become a county public road. On November 21, 1941 Greenleaf conveyed by the same description the interest he had to the Chattanooga, Gadsden and Gulf Railroad Company. On July 6, 1942, the probate judge made a tax deed to J. W. Broughton on sale for taxes of 1938, describing it as the old road and right of way of the old Alabama and Tennessee River Railroad Company. The evidence shows that the strip of land in controversy was assessed for the year 1938 to the Waynee Lake Corporation and the taxes on that assessment were paid by said company. J. W. Broughton exercised no acts of possession upon the land in controversy nor to any of that described in his deed, so far as shown by the evidence. On December 8, 1947, J. W. Broughton sold to B. W. Pierce, Sr., by quitclaim the same land as described in the deed to him by the judge of probate. There was evidence of a claim by Pierce of the land lying north of the railroad area. The Lees introduced a deed from Emma Line to S. W. Line, dated July 1919, conveying with other land the SE¼ and SE¼ of SW¼ of Section 17, Township 13, Range 7 East, except ninety-five acres south and west of the old railroad grade. The strip in controversy is also in the SW¼ of SW¼ of section 17.

The only claim by Pierce to the land in controversy was by virtue of the deed to him which we have mentioned. He also claimed possession, especially at the time suit was begun on January 14, 1949, insisting thereby that the claim of the Lees of a peaceable possession at that time was not well supported. In that connection counsel for appellant have asserted in brief circumstances which he contends show that on January 14, 1949, he was in possession or scrambling with the Lees for possession so as to contradict their assertion of peaceable possession at that time. They are:

1. That as soon as he purchased from Broughton he took possession under his deed which he put on record. But the only acts which he claims to have done are set up in succeeding paragraphs. So we will go to them to see what they are.

2. Appellant claims the following acts of possession in the second paragraph; that in January 1948 he caused survey stakes to be stuck along the line one hundred feet south of the center of the road.

We observe that the Lees had not acquired the land at that time, but it was still owned by the Lays who knew nothing of such stakes. Scales, as a tenant of the Lays, moved on the land January 5, 1948, and at that time Everett Lay was living

in the lodge at the lake. Scales testified that some time in June 1948 he found a few stakes along the line south of the road and within the line of the wire fence and he pulled them up. There is some evidence by Pierce that he caused survey stakes to be put along this line, which he measured, both in January 1948 and in the spring of 1948. All of this is shown to have occurred before the Lees acquired any interest in the land, and the owners of it at that time who seem to have been the Lays in January 1948, and Owens and Propst in the spring of 1948, had no notice of such act on the part of Pierce. Nothing else seems to have been done by Pierce in connection with the possession of the land so far as it affected the Lees until December 10, 1948, when he put a lock on the gate, as stated above, and then again on January 12, 1949 when he caused a small tree to be cut in the field south of the fence.

The other numbered paragraphs of the contention of appellant's counsel as to acts of possession on January 14, 1949 are mere claims of ownership rather than any acts of possession, other than what we have mentioned. We are now referring to certain notices and claims which Pierce set up to the land, but they are only claims of ownership and not claims of possession.

We take note of the fact that the evidence shows that it was only the western portion of this strip of land in controversy which was cultivated, as to which there was actual possession on the part of anyone. The wire fence extended further east into the woodland and was put there by the Lays, as we have said, to protect the property as a recreation area from intruders. The other land extending to the east line of section 17 does not seem to have been in the actual possession of anyone during the ownership of the Lays and Owens. It was included in the chain of title of the land under which the Lees claim, and was in the deed to them. We have noted there was a reservation in the deed to the Lees of the timber by Propst until January 1, 1950. Whatever acts of possession by Pierce after Lee became the purchaser of it was in respect to the timber on the land, not then claimed by the Lees.

He showed no possession or claim of possession of any of it, except the timber and that was a controversy between Pierce and Propst, and was not evidence of possession by Pierce hostile to the Lees. We also note that the evidence does not show any acts of possession of any of the land in controversy by the grantees of the deeds in the chain of title by which Pierce claims the land. The railroad presumably graded a road bed prior to 1890 when it became a public road of the county. But if this was done, it was abandoned for sixty years at least. The evidence does not show that the owners of the land north of that road bed ever asserted any claim or right of possession to the land south of the graded road, but the contrary is fully established.

There is no evidence that Broughton, who purchased under the tax sale, ever undertook to take possession of any of the land in his deed. There are some affidavits in the record which were used in connection with an injunction which was issued, but those affidavits were not permitted as evidence in this case. Appellant does not contend that the tax deed is more than color of title to Broughton and that Broughton's deed to appellant is more than color of title. It is not necessary therefore to examine in detail the steps necessary to be taken to effect a good tax title or the dual assessment. Walthall v. Yohn, 252 Ala. 262, 264, 40 So.2d 705. Those conveyances certainly were color of title.

As we have previously stated, the primary inquiry here is whether or not the possession of appellee was peaceable on January 14, 1949, when the bill was filed, or whether appellant was scrambling for possession with them. On that question we have some established principles which are well understood, to which we will now refer. The proof must show that complainant's possession was peaceable as distinguished from contested, disputed or scrambling; but that a denial of the right or title of complainant to the property will not destroy the effect of his possession otherwise peaceable, since the defendant must do something indicating that he claims to be in possession himself, sufficient upon which complainant could found a proceed-

ing against him in order to test their respective rights. Wood Lumber Co. v. Williams, 157 Ala. 73, 47 So. 202; Buchmann v. Roberts, 213 Ala. 520, 105 So. 675; Montgomery v. Spears, 218 Ala. 160, 117 So. 753; Dawsey v. Walden, 243 Ala. 93, 8 So.2d 417; Webb v. Griffin, 243 Ala. 468, 10 So.2d 458; Walthall v. Yohn, supra. The criterion is the date of filing the bill. Davidson v. Blackwood, 250 Ala. 263, 34 So.2d 205.

The nature of the acts of possession of a person seeking to defeat such a suit on the principle that he is contesting the possession of complainant at the time when the bill is filed is well illustrated in the case of Jordan v. McClure Lumber Co., 170 Ala. 289, 54 So. 415, 421. We quote from the opinion in that case as follows: "It is true that the evidence shows that some of their employés were ordered off the lands by the respondents, and that the latter posted notices on the land warning complainants not to trespass thereupon. This was, however, a mere adverse claim of title. It was not possession on the part of the respondents such as to defeat the bill. In fact, it was this very disputed claim of title or right on the part of the respondents which authorized the filing of the bill against them. This is the very kind of disputed claim or title which the statute is intended to quiet or determine. Merely going upon lands which are at the time in the actual possession of another, and claiming title thereto and warning such other off, is not such possession as will maintain or defeat a bill filed under the statute. It requires actual or constructive possession; and, while it must be peaceable, it does not mean that the right or title thereto must not be disputed, for that is what the suit is intended to determine and quiet. The real object and purpose of the suit is to determine whether respondents have any title, right, or claim, legal or equitable, in the lands the subject of the suit; and, if so, to determine its character and extent."

We also quote from Wood Lumber Co. v. Williams, 157 Ala. 73, 78, 47 So. 202, 203, as follows: "The only facts in this case tending to show any contesting or disputing of the possession of the complainant are that in 1904 McGowan, as the agent of respondent, placed notices on various parts of the land, forbidding trespassing on the land, and that respondent had an attorney employed to look after the land and prevent trespassing. It is not shown where the notices were placed, to whom they referred, nor that the complainant ever saw them; and, of course, the employment of a lawyer, who did nothing to disturb the possession, could not mar the peacefulness of the possession."

In order for the complainant to maintain this suit it is not necessary that it was in the actual possession of all of the land in controversy at the time the suit was filed. It is sufficient under the statute if it was either actual or constructive possession, provided it was peaceable. The complainant in this case shows that at the time of the filing of the bill and for more than a year prior thereto it was in the actual possession of a part of the land in controversy, being the cultivated field south of the wire fence extending along the south grade of the roadway and other lands described in its deed. But there is no evidence of its actual possession of that part of the land on the east which was woodland. Neither is there any evidence of the actual possession of anyone of the woodland prior to the sale of the land to the Lees, reserving the timber, or what acts of possession of said woodland occurred prior to that time. Possession of the timber after that deed was executed was not hostile to the Lees who did not claim it.

There is some controversy noted in our cases as to whether or not one who is in actual possession of a part of the land in his chain of title is in the actual possession or the constructive possession of that part which he is not in the physical, actual possession. Some of the cases say that one in possession of land claiming under a deed is held to be in the actual possession of the entire land. Others say that he is in the constructive possession by virtue of his actual possession of a part of it. See the cases noted in 2 Alabama Digest 221–222, Adverse Possession, ☞100(1).

It is immaterial, so far as we are here concerned, whether it is one or the other. It only applies of course where no one else is in the actual possession of the land in controversy.

So that on January 14, 1949, there was no one in the physical, actual possession of the surface of the woodland involved. The Lees were in possession of the balance of the land and that possession was actual. The acts and conduct of appellant in this case are not sufficient under the authorities of Jordan v. McClure, supra, Wood Lumber Co. v. Williams, supra, and cases cited above, to constitute a contested or scrambling possession on his part with respect to any of it on January 14, 1949, in hostility to the complainant.

We come now to an interesting question, or it would be interesting if the appellant was shown to have been in the actual possession on or prior to the institution of this suit of the land or any part of it deeded to him by Broughton on December 8, 1947. We would have two parties separately claiming a tract of land, which is included in the color of title claimed by each of them, and when no one is in the actual possession of it, the question is who is in the constructive possession of it, or rather whether the complainant was in the constructive possession of it on January 14, 1949. We do not have in this State, so far as we can find, any cases on that subject, but we find where the question is fully discussed in 2 Corpus Juris Secundum, Adverse Possession, § 194, page 799, and in 1 Am.Jur. pages 912–913, section 209.

It is perfectly clear that two persons cannot be in possession of the same interest in the same tract of land adversely to each other at the same time and, therefore, it is necessary to consider the character of the claim and the possession by which it is accomplished. Sometimes it is said that the legal possession will be deemed to be in him who has the best title and sometimes it is said it is with him who had the prior possession, which must of course be continuous down to the crucial date.

In this case whatever possession the railroad company had long since terminated by abandonment. The possession of Hindman in 1923 of the dwelling house and cultivated field and other land in his deed extended to the whole tract described in his deed, since no one else was in actual possession. Subsequent to that time there is no evidence of possession of this area south of the graded right of way by anyone so far as here material, except by Hindman and those under him who claim title extending down to the complainant. The possession of Hindman along with that of Fred Lucy, the Waynee Lake Corporation and the Lays was of sufficient character and duration to confer the legal title and, therefore, the legal title passed onto the Lees with the exception of the timber reserved by Propst. So that at the time the appellant was setting up his claim of title it had vested in the Lays and their successors, and their possession of the cultivated field and the tenant house and other land in their deed extended to and included the woodland under the principle which we have stated and which is supported by the authorities cited above.

We take it, therefore, the court correctly held that complainant was in the peaceable possession of the strip of land described in the complaint at the time the bill was filed and also had the title to it, and that appellant Pierce was not in possession at that time nor was he then contesting such possession as defined by our cases so as to prevent a determination of their respective interests in the land.

The decree of the lower court is affirmed.

Affirmed.

LIVINGSTON, C. J., and LAWSON and STAKELY, JJ., concur.