178 So.2d 146

**MERCHANTS NATIONAL BANK OF MOBILE et al.**

v.

**C. B. HALL.**

**1 Div. 245.**

Supreme Court of Alabama.

Sept. 2, 1965.

Chas. B. Bailey, Jr., for McCorvey, Turner, Johnstone, Adams & May, and Lyman F. Holland, Jr., for Hand, Arendall, Bedsole, Greaves & Johnston, Mobile, for appellants.

Jas. R. Owen, Bay Minette, for appellee.

HARWOOD, Justice.

C. B. Hall filed a bill in accordance with Secs. 1109 et seq., Title 7, Code of Alabama 1940, to quiet title to certain lands situated ·in Baldwin County, Alabama. By amendment the Merchants National Bank of Mobile and the First National Bank of Mobile, as trustees of the Dr. Monte L. Moorer Foundation, were designated as respondents. For convenience the respondents will hereinafter be referred to as the Banks.

The Banks' demurrer to the bill being overruled they filed an answer and cross bill in which they prayed for a decree establishing and defining the true boundary line between the property of the complainant and the property of the respondents, and for an accounting by the complainant for funds received by complainant from timber cut by complainant on the disputed tract.

The complainant's demurrer to the answer and cross bill was overruled, and complainant then filed his answer to the cross bill. Issue was then joined.

The suit essentially involves a dispute as to the true boundary line between the con-tiguous property of the complainant and respondents.

The boundary line asserted by the respondents was allegedly an old boundary line anchored to a lightwood stob on the southeast corner of their property with a blazed line running in a westerly direction.

The line asserted by the complainant was based on a survey made by N. L. Durant for the complainant in 1962. This line was roughly some 483.5 feet north of the old blazed line contended for by the respondents. The strip lying between the two lines contains some 137 acres, and is the disputed land.

After hearing, the court rendered its decree in which it found, among other things, the true boundary line to be as asserted by the complainant, and that the respondents had no right or title to the strip of land lying between the boundary line asserted by the respondents and that asserted by the complainant.

The evidence introduced below shows that the land of the complainant and that of the respondents was originally a part of a tract of land lying in the Thomas Byrne Spanish Grant Section 8, Township 2 South, Range 2 East, in Baldwin County. In 1862

the original tract was conveyed by Byrne to Young C. Hall, and was specifically described, with the addendum that the land conveyed was "supposed to contain fourteen hundred acres."

In 1892 Young C. Hall by three separate deeds conveyed to each of his three children respectively a part of the land he had acquired in 1862, the totality of the conveyances consuming the entire tract.

Each of these conveyances recited that the respective portion conveyed consisted of one-third of the original Young C. Hall tract. Thus each child acquired 466.6 acres, since the Young C. Hall tract was supposed to contain 1400 acres.

The north one-third was thus conveyed to Origin C. Hall, the middle one-third to Virginia M. Jernigan, and the south one-third to Lyman J. Hall. Lyman J. Hall was the father of the complainant. The boundary lines between the respective tracts were not fixed in these deeds.

The south one-third was bequeathed to the complainant and his brother, Joseph Hall, by their mother, Laura Hall. In the will of Laura Hall this south one-third is described as being "bounded on the north by the Charles Hall land," and was stated to consist of 467 acres.

By various deeds the complainant secured interests of Joseph Hall in the south one-third of the land bequeathed in his mother's will.

Again in these deeds to complainant the south one-third is described as being bounded on the north by the lands of Charles Hall, and was stated to contain 467 acres.

In 1954, the complainant executed a gas, oil, and mineral lease on this south one-third tract which recited that the tract contained 467 acres.

The uncontradicted evidence shows that for the years 1931 through 1962 the complainant, and his predecessors in title to the south one-third, described the land in their tax assessments as being "467 acres north of the Louisville and Nashville Railroad in Sec. 8, Township 2 South, Range 2 East." In 1963 this assessment was changed to increase the area to 686 acres.

Thus the record title of complainant is clearly shown to be to the south one-third of the original Young C. Hall tract, or 467 acres, on the basis that the original Young C. Hall tract contained 1400 acres.

Dr. Monte L. Moorer derived his title from Clara J. Hall, Mattie Louise Hall, both unmarried, and Ethel Ray Hall, a widow. These three had derived their title to the north two-thirds of the original Young C. Hall tract from Origin C. Hall and Virginia M. Jernigan, the original grantees of the two north thirds.

In their deed to Dr. Moorer the land conveyed by the above named grantors was described by metes and bounds, with the following addition:

"It is the intention of the parties of the first part to convey to the party of the second part and they do hereby convey to him all lands now owned by them in Section 8, Township 2 South, Range 2 East above referred to regardless of whether such lands are correctly described or not."

In connection with this addendum to the description Paul Teter, an abstracter with the Baldwin County Abstract Company, and a witness for the complainant, testified that he prepared an abstract covering a parcel of land in Section 8, supra, in the course of which he was shown a survey purportedly made by a Mr. Greenwood. This survey was not certified, nor recorded, and showed no amount of acreage, but was supposed to show the middle one-third of the original Young C. Hall tract. Teter did not know if the plat was accurate. Moorer had contracted to buy the north two-thirds of the original Young C. Hall tract or roughly 934 acres. The description contained in the deed to Moorer was prepared by Teter after searching the records but he did not know whether the description was accurate. After a discussion of

the accuracy of the description, it was decided to put in the addendum to the description.

Thus it is clear under the evidence that at the time of the proceedings below the record title to the north two-thirds of the original Young C. Hall tract was in the Banks, as trustees of The Dr. Moorer Foundation, and the record title to the south one-third of said tract was in the complainant. Since the original Young C. Hall tract was described in the deeds by Young C. Hall as supposed to contain 1400 acres, the north two-thirds should be deemed to contain 933.2 acres.

As before stated, the complainant claims the north boundary line to be one established by the Durant survey made at his request in 1962.

On direct examination Mr. Durant testified that complainant's Exhibit 2 was a plat of a portion of the Thomas Byrne Grant. Actually, it is a plat of the lands claimed by complainant. He obtained a description of the property from the courthouse records, and the location of the northeast corner of complainant's land (which would be the southeast corner of respondent's land) was established from the record (description) of the property on the north, that is by reference to the description of the Moorer land contained in the deeds from Clara L. Hall et al to Dr. Moorer.

On cross examination Mr. Durant testified that his survey was predicated entirely on the description and figures contained in the deed from the Hall sisters to Dr. Moorer, and he had no knowledge of the correctness of this description. His location of the northeast corner of complainant's land "tied into the railroad with the description we had, more or less reasonably close; it didn't check exactly." These figures tying into the railroad he thought possibly came from the tax assessor's office, but he was not sure where they came from.

In his survey of the east boundary line, Mr. Durant found a lightwood stob that had apparently been there twenty or thirty years, and there were old "witness trees" around this stob. There was a blazed line running westerly from this stob, with some of the trees having been reblazed.

The northeast corner of complainant's tract, as established by Durant's survey, was some 483.5 feet northwesterly of the old stob. Mr. Durant stated there was no evidence of any prior location of the northeast corner at the place he established it.

From the northeast corner as established by his survey, Mr. Durant ran a line westerly to the river "according to the map," and thus established the northern boundary of complainant's land. He blazed a line along the boundary. According to Mr. Durant's survey the complainant's part of the original Young C. Hall tract would contain 686.1 acres. This Durant boundary was of course north of the old blazed line running from the old lightwood stob.

Since Mr. Durant established the northeast corner of complainant's land by reference to the description contained in the deeds to Dr. Moorer, the probative force of the correctness of his location is rendered negative when it is remembered that in these deeds to Dr. Moorer it was provided by the addendum that it was the intent of the grantors to convey all lands owned by them in Section 8, supra (i. e., the northern two-thirds of the Young C. Hall tract) "regardless of whether such lands are correctly described or not."

O. W. Lyles, a witness for the complainant, testified that for some eighteen years he had been a forester for S. M. Adams, Inc., and was familiar with the land involved in this suit.

About eighteen years ago Adams had, at shortly separated intervals, bought the timber from the then owners of both the northern two-thirds portion and the southern portion of the Young C. Hall tract. The timber on the north portion was cut first, and he had cut down to the Durant line. A short time later he had cut the timber on the southern portion after Adams acquired it from Mrs. Laura Hall, mother

of the complainant. This time he had cut northerly up to the Durant line.

Y. C. Hall, a brother of the Moorer grantors, had shown him the boundary line at the earlier time, and after Mr. Durant made his survey he again looked at the north line of complainant's property (south line of respondent's) and it was the same line as he had cut to eighteen years previously.

On cross examination Mr. Lyles testified that at the time Y. C. Hall showed him the boundary line there was a lightwood stob marking the southeast corner of the Hall sisters' property, and the northeast corner of the complainant's land, and a blazed line was marked westerly from the stob. This line was plain, and he marked it with paint.

Adams again cut timber on the south one-third of the Young C. Hall land at the time Mr. Durant was making his survey in 1962. Durant had established the northeast corner of complainant's land, and according to Mr. Adams the lightwood stob was within a few feet of the corner established by Durant, with stakes at intervals marking the line westerly. Mr. Lyles did not recall ever seeing any "witness trees" near the lightwood stob.

Mr. Lyles' testimony is confusing in that he correlates the old blazed line running from the lightwood stob and the later Durant line as being one and the same. This is contrary to all the other evidence introduced, and the Durant survey, introduced as complainant's Exhibit 2 destroys any probative value of Mr. Lyles' testimony in this regard.

Mr. Randolph McGowin, a witness for the complainant, testified that he had lived in Bay Minette about 45 years and had been familiar with the land in question for a long time in a general way, but not with the lines. However, in 1947 he sold the timber on the southern portion of the tract for Mrs. Laura Hall, mother of the complainant. At this time a Mr. Quinley, now dead, who had been in charge of the land for complainant's father, showed him the north boundary of the land now claimed by the complainant. Mr. Quinley had told him he had been with Captain Durant (not the present surveyor by that same name) when the land was originally divided. When he sold the land for Mrs. Laura Hall the timber was cut to the northern line indicated on complainant's Exhibit 2, (the present Durant survey made in 1962). About a year later he sold the oak on this tract. No one disputed Mrs. Laura Hall's possession up to the Durant line at this time.

On cross examination Mr. McGowin testified that for the past 30 years the complainant had assessed the tract now in dispute as containing 467 acres. Actually, Mr. Quinley had told him that complainant's tract contained 686 acres, and he had informed the owners of the southern one-third of the Young C. Hall grant that they had more than 467 acres, but the assessment was not changed until 1962 as to the amount of acreage.

As did Mr. Lyles, Mr. McGowin testified that a lightwood stob about sixteen inches high marked the northeast corner of complainant's land, and this stob was there before Mr. Durant made his survey in 1962. Mr. McGowin further testified:

"Q. Now tell us what kind of line was established there when you first knew it?

"A. It was a blazed line; I followed the blazes.

"Q. How close together was the blazes?

"A. Oh, some places they were a long ways apart and some places they were 200 or 300 yards apart.

"Q. Well, start at the east corner, you say you found a stob?

"A. Yes.

* * * * * *

"Q. Was there any difference when you knew it 16 years ago?

"A. What?

"Q. When you knew it 16 years ago and two or three years ago?

"A. Same.

\* \* \* \* \* \*

"Q. Did you see the stob when you were there two or three years ago?

"A. It was there the last time I was there; I have been there 50 times I reckon."

Mr. McGowin testified that the blazed line angled off from the stob something like 85 degrees and 50 minutes north of west, it was not due west from the corner.

We note this is the direction of the line shown on the Durant line.

Mr. McGowin further testified that complainant's correct north boundary line is that one as shown in the Durant survey (complainant's Exhibit 2) because Mr. Durant said it was correct, and the Durant line "is the line I have been going by all the time."

Thus, the only inference that can be drawn from Mr. McGowin's testimony is that the northern boundary line, as established by the Durant survey of 1962, and the old blazed line running from the stob are one and the same. Again, the Durant survey denies the probative value of this testimony.

In his own behalf, Mr. C. B. Hall, the complainant, testified that he is 68 years old, and has lived in Sacramento, California, for the past 43 years. Since living in California he has been on the property involved in this litigation about a half a dozen times. The property was owned by his father, Lyman Hall, and subsequently by Hall's mother, brothers, and sisters, from whom he acquired his title.

Mr. C. B. Hall has sold timber from the land twice, about ten or twelve years ago, and again in 1962 or 1963, after the Durant survey. He did not know the location of the line to which the first purchaser of the timber had cut, but after the Durant survey it was cut to the north line shown on that survey.

The land had been surveyed before his time by Captain Durant (not the present Durant survey) and stakes had been put in to show the location of the line and blazes had also been made by Captain Durant.

While Mr. Hall testified on direct examination that he was in the actual, peaceable possession of all the land described in the bill of complaint claiming to own in his own right, he testified on cross examination that he had the land surveyed in 1962 by N. L. Durant after a dispute had arisen prior to his brother's death in 1925, concerning the amount of acreage in the land. The northern line had been disputed prior to his father's death in 1925 by an uncle who owned the south middle third.

Mr. Hall further testified on cross examination that he had signed an oil, gas, and mineral lease in 1944, and a right-of-way agreement in 1956, in which his land in question was described as containing 467 acres. He also testified that he had accepted deeds to the land from parties owning an interest therein in which it was described as containing 467 acres.

For the respondent Banks, Mr. Brooks Bush testified that he had lived within a quarter to a half mile from the Hall property since 1920 and had looked after the property for the Hall sisters during most of that time. He was familiar with the old lightwood stob on the east line of the property, with a glazed line running in a westerly direction from the stob. There were well marked and very old witness trees in the immediate area of the stob. The owners of the land to the north of the old blazed line had cut timber thereon more times than he could remember. He specifically remembered a cutting in the 30's, and subsequent cutting by Adams. He remembered one occasion when the owners to the south had cut over the line and they paid the Hall sisters for the timber so cut. The Hall sisters had always claimed to the

blazed line. When the Durant survey in 1962 changed the line some 600 feet north of the old one, he wrote the Merchants Bank of Mobile of the situation.

Mr. G. B. Espy, a witness for the respondents, testified that he is a registered surveyor with many years of experience. He was employed to, and did, make a survey and plat of the original Young C. Hall lands. He found it to contain an estimated 1,501 acres rather than 1400 acres it was supposed to contain. He estimated the acreage because he was unable to survey the marshy east bank of the Tensaw river (the west property line) and established the west line by use of aerial photographs on the same scale as the survey. The correctness of this west or river line as shown by Mr. Espy was stipulated by the parties.

Mr. Espy was shown the lightwood stob by Mr. Brooks Bush from which there was a line running in a westerly direction indicated by some fairly old blazed marks. He followed this blazed line for some 200 feet but had to stop because of a swamp area. He went around to the other side of the swamp area to the end of the line near the river and found a line which appeared to be an extension of the blazed line from the old lightwood stob.

In addition to the perimeter of the entire Young C. Hall tract as surveyed by Mr. Espy, there is shown on the plat prepared by him the old blazed line running westerly from the lightwood stob as well as the line established by Mr. Durant in his 1962 survey. The strip of land between these two lines is shown to contain 137.32 acres.

The Espy survey also shows that the tract of land north of the old blazed line contained approximately 927.76 acres and the tract south of the old blazed line would contain 564.10 acres.

In its decree the court found that the north boundary line of complainant's land was as described in the bill of complaint and in accordance with the survey estab-lished by Mr. Durant in 1962 (complainant's Exhibit 2).

This in effect would give the complainant 686.1 acres on the south end of the original Young C. Hall tract, according to the Durant survey of 1962.

Under the Espy survey, if the old blazed line be taken as correct, the acreage north of such line (that claimed by the Banks) would be 927.76 acres, while that south of such line would be 564.10 acres.

The Espy survey is the only one showing the estimated total acreage of the original Young C. Hall tract, as well as the acreage in the various subdivisions thereof. While it was stated in the deeds by Mr. Hall conveying a third of this tract to each of his three children that the tract was supposed to contain 1400 acres, Mr. Espy's survey of the perimeter of the original tract showed that it contained an estimated 1501 acres, give or take 15 acres.

The Espy survey is the only one showing the acreages of the various claims, the Durant survey showing only the acreage south of the line established by his survey and claimed by the complainant.

The Banks, however, lay no claim to the property south of the old blazed line, but claim only the acreage north of the old blazed line, or some 927.76 acres. In other words the Banks claim only the north two-thirds of the original Young C. Hall tract supposed to have contained 1400 acres.

Under the uncontradicted evidence the record title to the north two-thirds of the original Young C. Hall tract is in the Banks, and the record title to the south one-third of said tract is in the complainant. Obviously the complainant's claim is greatly in excess of the acreage shown by his record title since the original Young C. Hall tract is shown under all the evidence to have contained more than its original estimate of 1400 acres.

The Banks having discharged their burden of proof by showing record title to

the north two-thirds of the original Young C. Hall tract, the burden of avoiding this proof of record title was upon the complainant to establish a superior title by adverse possession to any disputed portion of the land. St. Clair Springs Hotel Co. v. Balcomb, 215 Ala. 12, 108 So. 858.

■ Under Sections 1109 et seq. of Title 7, Code of Alabama 1940, the complainant must have the quiet and peaceable possession, actual or constructive, of the land claimed, as distinguished from a scrambling or disputed possession. Sanford v. Alabama Power Co., 256 Ala. 280, 54 So.2d 562. While the complainant testified on direct examination that he was in peaceable possession of all the land described in the bill of complaint, which would include the disputed strip, he testified on cross examination that a dispute had arisen in 1925 as to the acreage in his portion, and the line between his south one-third and the middle one-third was disputed in 1925, and has been disputed since. Thus under the complainant's own testimony it cannot be deemed that he was in peaceable possession of the strip between the disputed boundary between the south one-third and the middle one-third of the Young C. Hall tract.

The controverted strip of land involved in this suit was wild, unfenced woodland. The complainant testified he had sold the timber on his land, and it had been cut on two widely separate occasions, once some 10 to 12 years ago, and again in 1962. The extent of the timber cutting is not shown.

The complainant testified that he did not know how far north the timber had been cut the first time, though after the sale in 1962 it had been cut to the Durant line. Mr. McGowin testified he had sold the timber on the land for Mrs. Laura Hall to Adams some 16 years ago, and the timber has been cut northward to the Durant line. As before stated, Mr. McGowin's testimony is confusing in that a reading of his entire testimony shows that he correlates the Durant line and the old blazed line as being one and the same.

■ Thus under the complainant's evidence the only firm acts indicating an adverse use of the land by complainant consisted of two cuttings of the timber on the disputed land at widely separated intervals. Such intermittent and spasmodic cutting of timber on wild uncultivated and unfenced woodland was insufficient under our cases to establish by adverse possession. Turnipseed v. Moseley, 248 Ala. 340, 27 So.2d 483, 170 A.L.R. 882; Spradling v. May, 259 Ala. 10, 65 So.2d 494; Lay ·v. Phillips, 276 Ala. 273, 161 So.2d 477.

As before stated, the court established as the northern boundary the line shown by the Durant survey made in 1962. Mr. Durant testified that this line was established by him from the description in the deed by which the Hall sisters conveyed the land to Dr. Moorer. Mr. Teter abstracted the land at the time Dr. Moorer was considering buying it. Dr. Moorer showed him a survey of the middle one-third of the Young C. Hall tract made by Mr. R. J. Greenwood. Mr. Teter made a copy of this survey, and this copy was offered in evidence. On cross examination Mr. Teter testified that the Greenwood survey was signed by Greenwood as county surveyor as being a survey of the Charles Hall property, but that it was not certified and had never been recorded, and he did not know if it was accurate. It did not show any acreage.

Mr. Teter further testified that Dr. Moorer, under his contract of purchase with the Hall sisters was to buy the northern two-thirds of the original Young C. Hall tract in Section 8, supra, or roughly 930 odd acres. Because of the uncertainty as to the accuracy of the description prepared by him it was decided to put in the additional clause that it was the intent of the grantors to convey all the land they owned in Section 8, supra.

■ Even the original of the Greenwood survey, not being certified, and not showing that the opposite parties were notified, could not properly have been considered by the court. Clearly then the copy of such

survey made by Mr. Teter could not be considered. Section 7, Title 56, Code of Alabama 1940; May v. Willis, 200 Ala. 583, 76 So. 941; Dunn v. Cambron, 268 Ala. 651, 109 So.2d 705.

 Thus by the complainant's own witnesses, the Durant line of 1962 was shown to have been based upon the Teter description which in turn had been based upon the Greenwood survey, the accuracy of which was questionable to the extent that the addition conveying all the land owned by the Hall sisters (the northern two-thirds of the original Young C. Hall tract in Section 8, supra) was added. Such evidence cannot be deemed of any real probative value justifying the lower court decreeing that the Durant line was the correct boundary between the northern two-thirds and the southern one-third of the original Young C. Hall tract, and the decree of the lower court is erroneous in this aspect.

It is further noted that in its decree the court found and adjudged not only that the respondents had no right or title to the disputed strip, but that the complainant was the owner of the property.

The real object and purpose of a suit under Sections 1109 et seq., supra, is to determine whether a respondent has any title, right or claims, legal or equitable, in the lands the subject of the suit, and to determine its character. Jordan v. McClure Lumber Co., 170 Ala. 289, 54 So. 415; Pierce v. Lee Bros. Foundry Co., 255 Ala. 410, 51 So.2d 677. It is not the purpose of such bill to declare what title the complainant has. Wylie v. Lewis, 263 Ala. 522, 83 So.2d 346. It is a personal action.

The decree of the court, finding the complainant to be the owner of all the land described in the complaint is appropriate in an in rem proceeding only.

In the present proceedings the complainant's evidence shows that in obtaining the title to the land he now claims he secured a deed from Joseph Earl Hall and Ella B. Hall to their undivided interest in the property. These grantors reserved for their lifetime, and to the survivors of them for their lifetime, all oil, gas, and minerals in their undivided interest so conveyed. There was no evidence introduced showing that Joseph Earl Hall and Ella B. Hall, or the survivors of them were not living. The effect of the court's decree was to divest them of this reserved interest, and vest it in the complainant, though they were not parties in the proceedings below. This well illustrates the excessive limits of the present decree and its error in this aspect.

There being no evidence to support the court's decree fixing the boundary line between the complainant and respondents' land as being that shown by the Durant survey of 1962, the decree is due to be reversed and remanded to the lower court.

Reversed and remanded.

LIVINGSTON, C. J., and SIMPSON and MERRILL, JJ., concur.