Sanders and Woolsteen brought an action pursuant to § 35-3-1, Code of Alabama 1975, in the Circuit Court of Blount County to determine the boundary between themselves and Sandlin as coterminous land owners. Their complaint asserted ownership *Page 979 
up to the center of a dirt road, allegedly a public road, either by deed description or by adverse possession for 20 years. Sandlin filed an answer and counterclaim alleging the dirt road to be a private road lying wholly within his property.
The dispute over the proper location of the common boundary arose when Sanders and Woolsteen attempted to cut driveways from the road to the lot owned by the Woolsteens. Sandlin and his father objected. They placed logs across the driveways and erected a gate across the dirt road. The trial court held the common boundaries of the parties to be the center of the dirt road, declared the dirt road a public road and enjoined Sandlin from obstructing the road. Sandlin appeals from the judgment. We affirm.
Sanders acquired title to the NW 1/4 of the SE 1/4 of Section 31, Township 13 South, Range 3 West by a 1947 deed from his father, with the following description:
 "Beginning at the NW Corner of NW 1/4 of SE 1/4 of Section 31 Township 13 Range 3 West and running East 810 feet thence a South Westernly direction along center of road 1013 feet to the west Boundary line of NW 1/4 of SE 1/4 thence North 679 feet to point of Beginning."
In 1975 Sanders and his wife executed a deed to themselves transferring the same property to a joint tenancy with the right of survivorship, describing the property as follows:
 "A part of the NW 1/4 of the SE 1/4 of Section 31, Township 13 South, Range 3 West, Blount County, Alabama, more particularly described as follows: Begin at the NW corner of said NW 1/4 of the SE 1/4 thence South 0° 48' 49" East, 350 feet; thence North 89° 33' 11" East, 140 feet; thence North 0° 48' 49" West, 140 feet to the beginning. Containing 1.12 acres, more or less.
 "Also: A part of the NW 1/4 of the SE 1/4 of Section 31, Township 13 South, Range 3 West, Blount County, Alabama, more particularly described as follows: From the NW corner of said NW 1/4 of the SW 1/4; thence South 0° 48' 49" East, 350 feet to point of beginning; thence continue South 0° 48' 49" East, 328 feet; thence North 49° 27' 11" East, 1053.27 feet; thence South 89° 33' 11" West, 280 feet to the point of beginning. Containing 4.06 acres, more or less."
In that same year, the Sanders also conveyed a portion of the land to their daughter and son-in-law, the Woolsteens.
Sandlin acquired title to the following property by deed from his parents in 1967:
 "The Southwest fourth of Northeast fourth of Section 31, Township 13, Range 3 West, containing forty acres, more or less.
 "The Northwest fourth of the Northeast fourth of Section 31, Township 13 South, Range 3 West, containing 40 acres, more or less."
Sanders testified that when he went into possession of his property in 1947, the road was the boundary. He used the road in 1955 for access to a watermelon patch located west of the property in dispute and, after selling that west property in 1964, had used the road three or four times a year to inspect his northern boundary. He has not resided on the property since 1953. Since 1955 he has cut a few poles off his property and, after selling part of the property to his daughter, fenced his part of the property. Sanders testified that the first time he saw "no trespassing" signs on both sides of the road was October, 1975.
Sandlin testified that he has farmed on the north side of the road but has never farmed south of the road. However, he keeps the south side of the road bushhogged and several years ago planted fescue on both sides. He has also cut tree limbs from the south side to clear passage of the road. The road is the only means of ingress and egress to the homes of Sandlin, his father, and his son. In fact, the dirt road deadends at their homes. Since he acquired the property in 1967, Sandlin has posted "no trespassing" signs on both sides of the road.
H.J. Lang testified that he and his father had tended what is now the Sandlin's property 40 years ago. It was always his *Page 980 
understanding that the Sanders owned the left and Doc Johnson, Sandlin's predecessor in title, owned the right. The road was considered the boundary. According to Lang, anyone who wanted, had traveled the dirt road, and that hunters had used the road.
Jim Tyler, a friend of Sandlin's father for 17 years, testified that "no trespassing" signs had been on both sides of the road ever since he had been going there.
Larry Blaylock, a neighbor, testified that he had always heard the road referred to as Sandlin's road, that "no trespassing" and "no hunting" signs had been posted on both sides of the road as long as he could remember, and that he had seen Sandlin cutting trees on the south side of the road one time.
Sandlin's father, Hershel Sandlin, testified that he had posted signs on both sides of the road when he acquired the property in 1960. He uses the road every day and had sold three or four pine trees off of the property south of the road.
Gene Blaylock, a member of the County Commission representing District I, in which the disputed property lies, testified that Sandlin owns land on both sides of the road. Until two years ago, the County worked anyone's private road, but now maintains only public roads. The County has maintained the dirt road in question both prior and subsequent to this policy change. Blaylock stated that the road is used by public vehicles such as county school buses and mail carriers.
Sanders presented three "surveys," all setting the boundary between the NW 1/4 of the SE 1/4 and the SW 1/4 of the NE 1/4 of Section 31 in the center of the dirt road. Sandlin introduced a survey establishing the boundary approximately 20 feet south of the road. The different conclusions of the surveys revolves around the measurement of the length of the northern interior quarter-quarter line of the NW 1/4 of the SE 1/4 of Section 31, thus affecting the location of the half section line under the methods used in Sanders' surveys.
A 1960 "possession" plat, performed by Rice, recorded the measurement of this northern interior quarter-quarter line as 1366.03 feet. The 1975 Hollis survey, adopted by the trial court in its final judgment, relies on this measurement in locating the half section line which divides the properties, as did plaintiff's Exhibit 17, performed during the trial in an attempt to verify the findings of the Hollis survey.
The issues presented for our review are (1) whether the trial court was plainly and palpably erroneous in determining the boundary to be the center of the dirt road; (2) whether the trial court was plainly and palpably erroneous in holding that the road is a public road; (3) whether the exclusion of Hershel Sandlin's offered testimony concerning statements by Johnson as to the location of the boundary was error; and (4) whether denial of Sandlin's motion for appointment of an independent surveyor was reversible error.
 I.
The trial court held:
 ". . . [T]hat the Plaintiffs are entitled to the relief sought by their Complaint and that the Plaintiffs' property lies south of the road, and the Defendant's land lies north of the road, and the Court further finds that the northwest corner of the property of the Plaintiffs, Willis A. Sanders and Barbara Jean Sanders, and the southwest corner of the property of the Defendant is the northwest corner of the NW 1/4 of SE 1/4 of Section 31, Township 13 South, Range 3 West, as established by the survey of Frank S. Hollis, Registered Land Surveyor, Registration No. 9323, as shown by plat of said survey dated August 28, 1975, and that the boundary line between the lands of the parties hereto runs from said corner north 89° 33' 11" east along the road as shown in said survey, a distance of 810 feet, and as claimed by the Plaintiffs."
It is well settled that the decree of a trial court, hearing the evidence ore tenus, will not be disturbed on appeal unless the *Page 981 
decree is plainly and palpably erroneous. Varner v. Carr,291 Ala. 654, 286 So.2d 294 (1973); Deese v. Odom, 283 Ala. 420,218 So.2d 134 (1969). Sandlin contends that this presumption is overcome because the Hollis survey, adopted by the trial court, fatally relies upon the Rice survey's 1366.03 feet measurement of the northern interior quarter-quarter line. It is undisputed that the Hollis survey did rely heavily upon this measurement for determining the location of Sanders' northern boundary. Plaintiff's Exhibit 17, introduced to bolster the conclusions of the Hollis survey, likewise relies upon this measurement. (Although other calculations were made to determine the proper location of the half section line, Mr. Allred in constructing Exhibit 17 admittedly measured 1366.03 feet north to determine the northern boundary.)
In Merchants National Bank v. Hall, 278 Ala. 319,178 So.2d 146 (1965), the court stated:
 "Thus by the complainant's own witnesses, the Durant line of 1962 was shown to have been based upon the Teter description which in turn had been based upon the Greenwood survey, the accuracy of which was questionable to the extent that the additional conveying all the land owned by the Hall sisters (the northern two-thirds of the original Young C. Hall tract in Section 8, supra) was added. Such evidence cannot be deemed of any real probative value
justifying the lower court decreeing that the Durant line was the correct boundary between the northern two-thirds and the southern one-third of the original Young C. Hall tract, and the decree of the lower court is erroneous in this aspect.
* * * * * *
 "There being no evidence to support the court's decree fixing the boundary line between the complainant the respondents' land as being that shown by the Durant survey of 1962, the decree is due to be reversed and remanded to the lower court." (Emphasis added.)
The instant case is analagous. Here Mr. Rice, who performed the 1960 survey from which Sanders acquired the 1366.03 feet measurement, testified as follows:
 "Q. Let me ask you, from looking at this survey and the way it is prepared, can you define for us what type of survey it is?
 "A. Well, it is my judgment that it is a possession survey.
 "Q. You are, or were before you retired, a licensed surveyor, were you not?
"A. Yes.
"Q. In the State of Alabama?
"A. Yes.
 "Q. What is the difference between a possession survey and any other type of survey?
 "A. Well, a possession survey attempts to survey and describe and plat the corner as shown by the owner. In other words, the owner says, `this is what I want. I want you to survey and plat this property.' Now, if he had told me, `I want you to survey this property in order to locate and determine the property line corners,' this is not a possession survey.
 "Q. Now, do I understand your testimony Mr. Rice, that this survey that you hold in your hand was not done to locate the corners and boundaries of what it shows?
"A. That is my judgment.
 "Q. Would it be correct to say that it was done simply to plat the lines described to you by the owners?
"A. That's right.
 "Q. Now, have you reviewed this survey specifically at my request?
"A. That's right.
 "Q. Have you done some calculations to determine the correctness of certain lines of this survey?
 "A. We ran this survey through a computer and I have here a computer tape, or read out tape, indicating that the survey as far as the quality of the survey is concerned ia [sic] almost a perfect, and it pulls it back to the point of beginning with practically no error. As a matter of fact, the error isn't but about four-tenths *Page 982 
of a foot one way and about two-tenths the other way.
 "Q. Alright, let me point to you on your plat a figure there that is the one-fourth mile line in this survey and has a figure 1366.03, is that correct?
"A. That's right.
 "Q. Did you perform any calculations to determine the correctness as far as boundaries of this section with that figure?
"A. Now, I don't understand that. Say that again.
 "Q. Alright, did you perform any calculations to determine the correctness of that figure as far as the true boundary line of the section?
"A. No.
* * * * * *
 "Q. You cannot say, then that your survey, this survey, would correctly establish the boundary lines for this section?
 "A. No, the survey that I made would not establish the true boundary of the section, it couldn't do that."
Thus, the Hollis survey, as well as plaintiff's Exhibit 17, are subject to the same criticism as the Rice survey: that they did not determine the boundary by metes and bounds. Consequently, the trial court's decree, if based solely upon the Hollis survey, must be reversed.
However, additional evidence was presented to support the decree. There was conflicting evidence that the road was considered the boundary line. Furthermore, there was a great deal of discussion of the location of monuments or even whether some of the markers were indeed monuments. The Hollis survey determined a concrete monument on the northern interior quarter line to be approximately 30 feet south of the center of the road. There was, however, testimony that such a set-off was not unusual. The Brown survey, relied upon by Sandlin, on the other hand, determined a concrete monument near the NE and SE corner of the SE 1/4 of Section 31 to be located 35 feet too far south. While the above is not exhaustive of the testimony at trial, it does illustrate the conflict in evidence and interpretations of the surveyors.
 "It is the province and duty of the court to locate the disputed boundary line by finding and locating the true line. If this cannot be done with absolute certainty, the court should consider all the physical indications, reputation, general treatment of the parties, monuments, if any, and courses and distances." McLaurine v. Knowles, 257 Ala. 8, 10, 57 So.2d 543 (1952).
W.T. Smith Lumber Co. v. Bryan, 272 Ala. 303, 130 So.2d 15
(1960). We opine that the evidence of the reputation of the road as the boundary and the conflicting conclusions regarding the significance of the location of the monuments and purported monuments are sufficient evidence to justify the trial court's decree establishing the boundary at the center of the road.
Because the trial court made no findings of adverse possession of the disputed strip of woodland, we decline to comment on the sufficiency of Sanders' alleged adverse possession.
 II.
We do not agree with Sanders' contention that the trial court erred in declaring:
 ". . . that the road dividing the property of the Plaintiffs and of the Defendant, is a public road, the same having been used for a number of years for the delivery of the United States Mail over the same, that it has been used for the transportation by the public school buses for the delivery of children over the same, and has been maintained by Blount County for a period of time in excess of twenty (20) years."
This dirt road is bounded by woodland to the south and farmland to the north. It leads only to the property of Sandlin on which three families reside — Sandlin, his father, and his son. In addition to the evidence set out in the trial court's decree, there was also testimony that the road had been used by Sanders to reach a watermelon *Page 983 
patch in 1955 and three or four times a year to inspect his timber. Hunters had used the road as well as the Sandlins' visitors.
Sandlin contends that this case is governed by the principles set out in Benson v. Pickens County, 260 Ala. 436, 70 So.2d 647
(1954) where the court, in applying a presumption of permissive use, stated:
 "It is the established law, of course, that an open defined roadway in continuous use by the general public as a highway without let or hindrance for a period of twenty years becomes a public highway by prescription and if the landowner claims the use is permissive only the burden is on him to show it. (Citations omitted.)
 "But this principle has been held to be limited in its application to `well-defined highways running over improved or reclaimed lands, and is not applicable to wooded or unimproved lands, or lands which, though once reclaimed, have been "turned out," or left open and unused.' Locklin v. Tucker, 208 Ala. 155
-156, 93 So. 896. In such latter case mere user without tending to show adverse user under claim of right does not raise a presumption of dedication. (Citations omitted.) * * *
 "So in the instant case we think that in view of the desultory use — indeed almost non-user — of the `dim' way for so many years and the fact that the public authorities gave no recognition of the way — if so it could be called — by working it or exercising acts of ownership over it for more than twenty years, it would take clearer proof than has been brought forth to rebut the presumption that the use was merely permissive."
We, however, agree with Sanders' contention that the character of the land on which the road lies, the condition of the road, and, of course, the use to which it has been put require application of the presumption of dedication to public use as defined in Ayers v. Stidham, 260 Ala. 390, 71 So.2d 95
(1954).
 "As we understand the evidence in this case, it supports no other reasonable conclusion than that the road which Stidham obstructed, although in a bad state of repair and infrequently used, was a public road. It is without dispute that it has been open to the use of those who wanted to use it for more than sixty years. It ran through reclaimed lands. Under our cases this is sufficient to raise a presumption of dedication to public use. It is now settled in this state that an open, defined roadway, through reclaimed land, in continuous use by the public as a highway without let or hindrance for a period of twenty years becomes a public highway by prescription. When such circumstances are shown, a presumption of dedication or other appropriation to a public use arises. The burden is then on the landowner to show the user was permissive only, in recognition of his title and right to reclaim the possession." 260 Ala. at 392, 71 So.2d at 97. (Citations omitted.)
Davis v. Linden, 340 So.2d 775 (Ala.Sup.Ct. 1976); BaptistFoundation of Alabama v. Penn, 295 Ala. 122, 324 So.2d 766
(1975).
Our conclusion is not altered by the fact that the road deadends on the Sandlin property, Baptist Foundation, nor by the fact that ". . . as a practical matter the road was used primarily, if not solely, by the landowners bordering the road, and rarely by anyone else." 340 So.2d at 777. Appellant failed to satisfy the burden ". . . to show the user was permissive only, in recognition of his title and right to reclaim the possession." 260 Ala. at 392, 71 So.2d at 97. The trial court did not err in holding the road in question to be a public road.
 III.
The trial court refused to admit testimony of Sandlin's father, Hershel Sandlin, concerning conversations with his predecessor in title, Doc Johnson, now deceased. The offered testimony referred to the location of the southern boundary of the property now owned by Sandlin. *Page 984 
 "Q. Mr. Sandlin, let me just ask you this. At any time before this property was purchased by you, did Mr. Johnson ever tell you or Mr. Campbell, or anybody else that owned this property, tell you that this property was to be used by anybody on the south side of the road?
"A. No sir.
"MR. WALKER: We object, please the Court.
"THE COURT: Sustained.
"MR. ELLIS: We note an exception.
 "Q. Did you ever have any conversation with Mr. Johnson about that road, and whether or not it belonged on your property?
"MR. NASH: We object, please the Court.
 "THE COURT: I am sorry Gentlemen, I will give you a ruling in just a minute. Go ahead and ask the question again.
 "Q. Did you ever have any conversation with Mr. Johnson about that road and whose property it was on?
"MR. NASH: We object.
 "THE COURT: Alright, I sustain. I will sustain on the basis that this gentleman does have some interest in the outcome of this law suit and will exclude the testimony about any conversation between them.
"MR. ELLIS: We accept [sic]."
Later, the trial court made it clear that he sustained the objection on the grounds of the Dead Man's Statute and on hearsay and self-serving declaration.
We find no error in the court's ruling because the offered testimony violates the hearsay rule. Sandlin failed to establish the necessary predicate that Johnson's declarations were made while he was in possession of the land and claiming as owner.
 "The declarations of a former owner, since deceased, are admissible in evidence, but in order that they may be received, they must establish some fact, as a cornerstone or particular marked line, and they are not admissible when they are mere statements that certain lands lay within the boundary of such former owner, or that it was the same as had been conveyed in a certain deed, or merely as to facts which might tend to a general reputation as to the true boundary. Also, evidence of declarations by an owner, since deceased, as to boundaries, is inadmissible unless made while he was actually in possession and claiming the land as owner." 12 Am.Jur.2d, Boundaries, § 107, p. 642 (Footnotes omitted).
Southern Iron Works v. Central of Georgia Railway Co., 131 Ala. 649,31 So. 723 (1901).
 IV.
The court denied Sandlin's motion to appoint an independent surveyor. Section 35-3-20 (a), Code of Alabama 1975, provides:
 "Whenever in any action pending in the circuit court it is pertinent and material to the determination of the issue or issues therein or to the proper entering of a description in the judgment therein to establish or fix a disputed land line or boundaries between coterminous landowners, or to locate the position of a line of the government survey, or to locate a landmarker or other object, the court may, as provided in this article, direct a competent surveyor or surveyors to make a survey for the purpose of fixing or establishing the disputed land line or boundaries between coterminous landowners or of locating the position of a line of a government survey or of locating a landmarker or other object."
This provision is discretionary with the trial court. W.T.Smith Lumber Co. v. Cobb, 266 Ala. 146, 94 So.2d 763 (1957);Redden v. Otwell, 252 Ala. 653, 42 So.2d 454 (1949); Stansellv. Tharp, 245 Ala. 270, 16 So.2d 857 (1944). While appointment of an independent surveyor "is usual and recommended," Deese v.Odom, we will not place the lower court in error for failing to do so where both parties have presented surveys, albeit conflicting in their conclusion.
AFFIRMED.
TORBERT, C.J., and BLOODWORTH, ALMON, and EMBRY, JJ., concur. *Page 985